[Civ. No. 14795. First Dist., Div. One. Jan. 29, 1952.]

JUANITA BANKS TERRY et al., Respondents, v. CIVIL SERVICE COMMISSION OF THE CITY AND COUNTY OF SAN FRANCISCO et al., Appellants.

Dion R. Holm, City Attorney, and Norman Sanford Wolff, Deputy City Attorney, for Appellants.

Adams & Reynolds, John Adams, Jr., and R. J. Reynolds for Respondents.

PETERS, P. J.—Respondents, citizens of the United States and residents of San Francisco for over nine years, were denied the right to take a civil service examination for playground director solely because they were not graduates of

one of the limited number of colleges accredited by the civil service commission. The commission, by rule, has provided that only graduates of certain designated colleges can qualify to take the examination. The day before this particular examination was to be given the respondents applied to the trial court for an alternative writ of mandate. The writ was issued and, at the same time, the trial court ordered the commission to permit the five respondents to take the examination, pending further orders of the court. Pursuant to this order the respondents were permitted to take the examination. Several months later the hearing on the writ was had, and, at its conclusion, the judge gave it as his opinion that the challenged rule was arbitrary, unreasonable and void, and ordered findings prepared accordingly. Before the findings were signed, the examination papers were graded and it was discovered that all five of the respondents had failed to make a passing grade. The commission thereupon moved to dismiss on the ground that the proceeding was moot. The motion was denied, and a judgment granting the peremptory writ was entered. The judgment declares that the rule in question is "arbitrary, unreasonable and discriminatory as between residents and citizens of San Francisco . . . with substantially equal educational qualifications" and that its adoption by the commission constituted an abuse of discretion. The commission appeals, contending that its accreditation rule, as a matter of law and fact, is fair and reasonable, and that the finding to the contrary is totally unsupported. The commission also contends, as it did before the trial court, that, since respondents failed in the examination, the entire proceeding is moot.

### Facts

The civil service commission announced that on April 8, 1949, an examination would be given for the position of playground director. In its official scope circular the duties of that position were described as follows:

"R56. PLAYGROUND DIRECTOR. Under general supervision: supervises play and recreation at a playground; organizes recreational activities including conducting clubs and groups in handicraft, dramatics, music, folk dancing, games and athletics, and other related activities; administers first aid in case of injury; prepares required reports on activities; and performs related duties as required."

The minimum requirements for this position were fixed by the commission and set forth in its circular as follows:

"MINIMUM REQUIREMENTS: Either

"1. Graduation from a university* or college* which shall have included courses or extra-curricular work which indicates an interest or aptitude for recreation work. Applicants shall state on the application blank the nature of their university work which indicates such interest in recreation work; or

"2. Two years of college* education, and at least one year of first class paid experience within the last five years as a playground director or in related recreational work.

"3. Successful completion of the two-year college course in recreational leadership given by the City College of San Francisco."

It was stipulated that each of the respondents filed an application, in proper form, to take the examination in question; that with each application there was filed an official transcript of the applicant's record indicating that each applicant was a graduate of a university or college, and that each had taken such courses and had participated in extra-curricular work as to indicate "an interest or aptitude for recreation work" as set forth in the circular. It was further stipulated that the respondents' applications were denied and that such denial was based solely on the fact that the colleges and universities from which respondents graduated were not on the list accredited by the Association of American Universities or the Northwest Association of Secondary and Higher Schools.

It should be here pointed out that the list of accredited colleges published by the Association of American Universities is a "dead" list for the reason that that association ceased to publish such a list in 1948.

The examination announcement was released by the commission in February of 1949. The parties stipulated that at that time there were five regional associations that accredited colleges and universities within their respective areas, and that such associations were:

The North Central Association of Colleges and Secondary Schools;

---

*"University or college education to be acceptable must be in universities or colleges on the accepted list of the Association of American Universities, or the Northwest Association of Secondary and Higher Schools."

The Middle States Association of Colleges and Secondary Schools;

The New England Association of Colleges and Secondary Schools;

The Southern Association of Colleges and Secondary Schools;

The Northwest Association of Secondary and Higher Schools.

It was further stipulated that each of respondents is a citizen and resident of San Francisco, and is a graduate of a college or university that is an accredited member of the Southern Association of Colleges and Secondary Schools.

The stipulation then sets forth a table showing the number of colleges and universities accredited by the regional associations, and the number in each region accredited up to 1948 by the Association of American Universities. The substance of this table is that, in all but the New England association, there are substantially more schools accredited by the regional associations than were formerly accredited by the national one. The northwest association is limited to colleges in California, Idaho, Montana, Nevada, Oregon, Utah, Washington and Alaska.

It was stipulated that 336 persons applied to take the examination here involved, that 208 qualified and that 188, exclusive of the five respondents, actually took the examination.

The evidence establishes, without contradiction, that there is little or no difference in the standards used by the five regional associations to accredit colleges and that, in educational circles, the accreditations are interchangeable. Herman A. Spindt, Director of Admissions of the University of California at Berkeley, so testified. He further testified that the University of California accepts the judgment of any of these regional associations in admitting students. P. F. Valentine, Dean of Instruction of San Francisco State College, and chairman of a committee that determines the admission policies of that school, agreed with Spindt, and further testified that his school accepts students from other accredited schools on an equal basis. It was his opinion that there was no reason to discriminate between the accredited schools of the various associations. He stated that he was familiar with the accreditation standards of the southern association and of the northwest association and that there was no substantial difference

between the standards adopted by each. There was other evidence that other groups accept the regional associations' recommendations interchangeably.

William L. Henderson, Personnel Director and Executive Secretary of the Civil Service Commission, testified that the duties of playground director as set forth in the scope circular have been the same for the past 20 years, but that the "Minimum Requirements" have been changed. Up until 1947 the requirement was "graduation from a recognized university or college with major work in recreation, physical education, sociology or child psychology." Henderson testified further that the requirement that the applicant must be a graduate of a college accredited by either the national association or the northwest association was added after the 1947 examination for this position, and was added at his suggestion. He attempted to justify the limitation to colleges accredited by these two associations on the ground that the commission, in the past, had occasionally run into difficulty in determining what was a "recognized university or college" within the meaning of the old rule. He felt that a fixed standard was needed so that the nature of the educational requirement would be clearly indicated. He also felt that a sufficient number of San Francisco citizens could qualify under the new rule so as to assure sufficient applicants for the available jobs. Thus, he gave two reasons for the new rule. Expressed in his own language these two reasons were: "One, we wanted to establish a definite fixed standard which everyone would understand and we could administer and, secondly, we wanted to assure adequate competition by qualified persons." He finally explained: "Now, we had to draw the line somewhere and we drew it at that point."

Henderson stated that graduates in the northwest area included the bulk of all applicants, but he admitted that he had made no population or other studies in reference to the problem. Prior to the war, according to Henderson, 80 per cent of the persons in the municipal service, who had to be college graduates, came from the five colleges located around San Francisco Bay. Henderson had no idea how many citizens of San Francisco were graduates of colleges outside the northwest area. He was of the opinion that about half the colleges of the United States would be included in the accreditation lists of the northwest regional and the national associations.

On this evidence the trial court found that the southern regional association has accrediting standards substantially equal to those of the northwest regional association; that colleges generally accept the graduates of any accredited college without discrimination; that the graduates from excluded colleges are as well qualified as those from the included colleges; that the inclusion of graduates of all of the colleges accredited by all of the five regional associations would impose no hardship or inconvenience on the commission; that the change from "a recognized university or college" to the new rule was made merely to avoid "indefiniteness as to what constituted a recognized college," and because the commission "desired to draw a line somewhere," and because the commission felt that a majority of qualified graduates would be included in the rule as restricted; that no sound reason can be given for limiting recognition to but one of the five regional accrediting associations; "that the restrictive provision hereinbefore referred to is not practical in character or related to matters fairly to test the relative capacities of applicants, specifically these Petitioners, for the position to be filled, and is not an appropriate test to establish the merit and fitness of applicants, specifically Petitioners, and that any finding to the contrary by the Civil Service Commission is arbitrary, unreasonable and not founded on any fact or reasonable theory."

Based on these findings judgment granting the peremptory writ of mandate was entered.

### The Finding that the Challenged Rule Is Arbitrary and Discriminatory Is Amply Supported by the Evidence

This is the main question involved. The answer is clear—the commission had no legal power to limit public employment to the graduates of the colleges accredited by either of the two associations, and the rule so providing is arbitrary and discriminatory, and is void.

Section 7 of the San Francisco charter provides that employees of the city must be citizens and, with certain exceptions not here involved, must be residents of the city for at least one year before their appointment. Admittedly, all of the respondents possess these needed qualifications.

There are three other sections of the charter that should be mentioned, sections 140, 144 and 145. So far as pertinent here, these sections provide:

Section 140: ". . . All appointments in the public service

shall be made for the good of the public service and solely upon merit and fitness, as established by appropriate tests, without regard to partisan, political, social or other considerations. . . .''

Section 144: "Any citizen having the qualifications prescribed by section 7 of this charter may submit himself for any examination under conditions established by the civil service commission. . . .''

Section 145: "All applicants for places in the classified service shall submit to tests which shall be competitive, . . . Such tests shall be without charge to the applicants. . . . The tests may be written, oral, mechanical or physical, or any combination of them, practical in character and related to matters fairly to test the relative capacity of the applicants for the positions to be filled. The commission shall be the sole judge of the adequacy of the tests to rate the capacity of the applicants to perform service for the city and county. . . . No question submitted to applicants shall refer to political or religious opinions or fraternal affiliations. . . .''

The commission correctly argues that under section 144 it has the right to adopt rules and regulations fixing the conditions under which applicants may take civil service examinations. ▇ Undoubtedly the establishment of educational requirements for certain positions, where reasonably justified, is well within the power of the commission. It is conceded that the requirement of a college education for applicants to take the examination for playground director is a reasonable exercise of this power. ▇ But any rule adopted by the commission must be reasonable and not operate to discriminate unreasonably between qualified applicants. While it is no doubt the law that the discretion of the commission in reference to administration of the civil service act is a "high discretion" which will not be interfered with unless a clear abuse of discretion is shown (*Nelson* v. *Dean*, 27 Cal.2d 873, 881 [168 P.2d 16, 168 A.L.R. 467]; *Almassy* v. *Los Angeles County Civ. Serv. Com.*, 34 Cal.2d 387, 396 [210 P.2d 503]), the courts will not and should not hesitate to interfere where the commission attempts to discriminate between qualified applicants. ▇ The commission has the power to classify, but such classification must be reasonable. If unreasonable, those discriminated against have been denied the equal protection guaranteed by the state and federal Constitutions.

The proper restrictions on the power of a board or commission, or even the Legislature, were illustrated in the recent

case of *Accounting Corp* v. *State Board of Accountancy,* 34 Cal.2d 186 [208 P.2d 984]. In that case, a provision of the Business and Professions Code provided that no person would be permitted to practice public accounting unless he had been issued a permit. It was further provided that nothing in the chapter should prevent any corporation which had been legally organized and had engaged in practice in California for three years prior to the date of the statute from continuing such practice under its corporate form. Plaintiff was a corporation. It had not been engaged in the practice of accounting for a period of three years. The Board of Accountancy threatened to prohibit plaintiff corporation from practicing public accountancy. The Supreme Court held that the provision excluding plaintiff was arbitrary, stating (p. 191): "The evil of the proviso to section 5062 is that it confers a privilege to remain in business upon a class of corporations arbitrarily selected from among those engaged in public accounting at the time the new accounting chapter became effective." And again, at page 190: "But where a statute discriminates against individuals or corporations solely because they are new to the field and such discrimination does not appear to have any relation to the public interest, the legislation disregards constitutional protections against arbitrary classification. [Citing cases.]"

Of course, it is not and cannot be contended reasonably that the exclusion of graduates from colleges accredited by the other four regional associations in any way is in the public interest.

Under section 145 of the charter the civil service tests are to be competitive, practical in character and related to matters so as to test fairly the relative capacities of the applicants. A distinction between graduates of schools accredited by any one of the five regional associations is arbitrary. The evidence shows, without contradiction, that such a distinction is not based on any material differences in standards between schools in the various regions. It is not even suggested that the experience of the commission with graduates of the excluded schools indicated unequal qualifications. The evidence shows that the commission adopted this rule without investigation or knowledge of how, and to what extent, it would affect the citizens of San Francisco. It had no knowledge of population trends or of the number of new residents in this area in the past 10 years. The commission adopted

the rule without considering the standards of accreditation used by the various regional associations, and with full knowledge that it would deprive an appreciable number of San Franciscans of the opportunity to work for the city.

The commission seeks to justify its limited rule on the grounds that such rule made it easier for the commission to administer examinations, and that under the limited rule a sufficient number of applicants would be secured to fill all vacant positions. Such arguments indicate a lack of appreciation of the duties and responsibilities of the commission towards the residents of the city. The commission was not created for the benefit of the commissioners or its secretary, but to serve all of the people of the city. ▮▮ It is not only the duty of the commission to secure qualified persons for public employment, but also its duty to administer the act impartially and without discrimination to the end that those qualified may have the opportunity to compete for public employment. The privilege of working for the government, local, state and federal, is an important one. It should not be arbitrarily granted to some and denied to others equally qualified.

▮▮ It hardly needs citation of authority to establish the principle that the right to work is fundamental and enjoys the personal liberty guarantees of the Fourteenth Amendment. ▮▮ Any unreasonable limitation that deprives qualified persons of the equal opportunity to qualify for work is unconstitutional. (See *Bautista* v. *Jones,* 25 Cal.2d 746, 749 [155 P.2d 343].) The right to work for the government is, of course, not absolute, but it should be safeguarded from legislative or quasi legislative action which discriminates against persons or classes of persons. (*Abe* v. *Fish & Game Com.,* 9 Cal.App.2d 300 [49 P.2d 608].)

None of the cases cited by appellants suggests, far less compels, a contrary conclusion. *Thomas* v. *Kern,* 280 N.Y. 236 [20 N.E.2d 738, 129 A.L.R. 347], involved a rule of the civil service commission by which, on an examination for policemen, credit was given for college training of a particular type if such training were received at any institution accredited by New York State University. The rule was upheld. It will be noted that this case involves credits on an examination, and not qualifications to take an examination. Moreover, it does not appear from the opinion what the accreditation policy of the New York State University was. For all that appears, it may be as broad as that of the University of

California or the San Francisco State College, and other colleges generally. Those two named institutions, and many others, accredit all colleges accredited by any of the five regional associations. The case is of no help here.

Another case relied upon by appellants is also a New York case—*Price* v. *Morton,* 72 N.Y.S.2d 868. There the petitioner was excluded from taking an examination for health officer because he had only served a six months' internship and the requirement was one year's internship. The petitioner had what he considered a reasonable substitute for one year's internship—many years of medical practice, study and public service. The court upheld the one-year requirement as being reasonable. The opinion carefully points out that the requirement was the result of the deliberations and recommendations of a group of well-qualified physicians and was in accord with the requirements of several other jurisdictions. The court stated (p. 869): "While it is not unlikely that individuals will from time to time appear who though they cannot meet the qualifications can nevertheless perform the duties, the fact that such exceptional persons might be excluded does not make the regulation which debars them arbitrary."

In that case the requirement was the result of careful study and the weighing of relevant factors, and was reasonably related to the requirements of the position in question. In our case the requirement was not based on study or knowledge of the facts, and has no reasonable relation to the requirements of the position. Moreover, the one-year internship requirement would adversely affect only a few exceptional individuals. The requirement in our case obviously excludes a substantial number of otherwise qualified persons. The New York requirement is similar to the requirement of a college education. Although a few self-educated persons might have the equivalent of a college education, the power of the commission cannot be doubted to impose the requirement of a college education and thus exclude a few self-educated persons. The case is not in point on the issue before this court.

Under the circumstances disclosed by this record the finding that the questioned rule is arbitrary and discriminatory is amply supported by the evidence—in fact, the evidence would support no other conclusion.

### The Proceeding Is Not Moot

It will be remembered that, pursuant to court order, the respondents were permitted to take the examination, and

before judgment was entered the papers were marked and it was discovered that all respondents had failed to make a passing grade. Appellants claim that this renders the entire proceeding moot, and that for this reason the appeal should be dismissed.

The point is without merit. The question here involved is the legal right of respondents to take the examination, not the right to pass it. The rule here involved applies not only to this examination but to many other positions, and to future examinations. The matter involved is of great public interest and affects many citizens of San Francisco. ■ Of course, as a general proposition courts will not issue a writ of mandate to enforce an abstract right of no practical benefit to petitioner (*Clementine* v. *Board of Civ. Ser. Commrs.*, 47 Cal.App.2d 112, 114 [117 P.2d 369]), or where to issue the writ would be "useless, unenforceable or unavailing." (*Roscoe* v. *Goodale,* 105 Cal.App.2d 271, 273 [232 P.2d 879.) None of these cases involved matters of public concern almost sure to arise again.

■ The present case falls within the rule announced in such cases as *Rattray* v. *Scudder,* 67 Cal.App.2d 123 [153 P.2d 433]. There, petitioner's license had been revoked for one year, and he sought, by mandate, to review the order of revocation. Pending appeal, the one-year period expired, and the respondent moved to dismiss the appeal on the ground that the issue was moot. The court stated (p. 127) : "Apparently, this is a case where the appeal should not be dismissed if that action can be avoided. In any event, it should not be dismissed as moot, which is the ground most strongly urged. . . . As a practical matter this judgment, if allowed to stand, will have a direct bearing and real effect upon any renewal of the respondent's license, . . . Moreover, important public questions are involved both directly, with respect to this judgment, and indirectly, through the effect on future appeals in such cases which could not be determined before the license in question had expired." (See, also, *Johnstone* v. *Richardson,* 103 Cal.App.2d 41, 48 [229 P.2d 9] ; *Southern Pac. Terminal Co.* v. *Interstate Commerce Com.,* 219 U.S. 498, 515 [31 S.Ct. 279, 55 L.Ed. 310].)

The judgment appealed from is affirmed.

Bray, J., and Wood (Fred B.), J., concurred.