[No. C009484. Third Dist. Mar. 20, 1998.]

WILLIAM KIDD et al., Plaintiffs and Appellants, v.
THE STATE OF CALIFORNIA et al., Defendants and Respondents.

**COUNSEL**

Ronald A. Zumbrun, Anthonly T. Caso and Richard M. Stephens for Plaintiffs and Appellants.

Daniel E. Lungren, Attorney General, Robert L. Mukai, Chief Assistant Attorney General, Linda A. Cabatic, Assistant Attorney General, Cathy A. Neff and Geoffrey L. Graybill, Deputy Attorneys General, for Defendants and Respondents.

**OPINION**

**PUGLIA, P. J.**—The appellants (hereafter plaintiffs) appeal from a judgment on the pleadings in favor of defendants. Plaintiffs challenge an affirmative action program, the State Personnel Board's policy of "supplemental certification," which allows certain minority and female applicants for positions in the state civil service to be considered for employment even though they did not place in the top three ranks of the list of eligible candidates. The named defendants, the State of California (State), the State Personnel Board (Board), and the Department of Fish and Game (Department) (hereafter collectively defendants), argue the case is moot because prior to trial the Board suspended the Department's use of supplemental certification as a means of increasing minority and female employees within the Department. Plaintiffs argue defendants should not be permitted to avoid an adverse ruling by their eleventh hour rescission of the challenged policy, particularly

when the report upon which the Board based its order reserved to the Board the option to reinstitute supplemental certification if the Board finds that circumstances within the Department warrant its resumption.

In our view, plaintiffs are entitled to a determination whether their right to appointment to the state civil service was violated by the Board's long-standing policy of supplemental certification. Moreover, the fact that the regulations implementing the Board's supplemental certification policy have not been repealed demonstrates the issues here presented are not moot. Finally, and most importantly, the state policy which is challenged here is in conflict with provisions of the state Constitution and with statutes relating to employment in state government. The issues at stake in this appeal transcend the plaintiffs' interest in the outcome of this lawsuit. Accordingly, we shall address the merits of the action.

## I

Before we reach the issue of supplemental certification, it will be helpful to define the type of affirmative action with which the appeal is concerned. "The term 'affirmative action' often leads to unnecessary confusion and misunderstanding because of a failure in advance to agree upon or assume a definition for it. . . . It can be defined either as (1) a preference for certain persons where there is total equality of objectively ascertained qualifications, or (2) a preference for persons with lower objectively ascertained qualifications, to the corresponding exclusion of persons better qualified." (*Dawn* v. *State Personnel Board* (1979) 91 Cal.App.3d 588, 593, fn. 4 [154 Cal.Rptr. 186].) As we will explain, supplemental certification is a species of the latter.

Article VII, section 1, subdivision (b) of the state Constitution states: "In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination." In order to implement this constitutional charge, the Legislature in 1945 enacted Government Code section 19050, which states in relevant part: "The appointing power . . . shall fill positions by appointment . . . in strict accordance with this part and the rules prescribed from time to time under this part, and not otherwise. Except as otherwise provided in this part, appointments to vacant positions shall be made from employment lists." Government Code section 19057.1 states in pertinent part: "[F]or any open employment list, there shall be certified to the appointing power the names and addresses of all those eligibles whose scores, at time of certification, represent the three highest ranks on the employment list for the class, and who have indicated their willingness to accept appointment under the conditions of employment specified."

In 1977, the Legislature enacted a series of laws with respect to affirmative action in state employment. (Stats. 1977, ch. 943, § 1, pp. 2875-2876; Gov. Code, § 19790 et seq.) Government Code section 19797 requires each state agency and department to develop, update annually, and implement affirmative action programs which include explanations and specific actions for improving the representation of minorities and women in state service. Additionally, the Legislature directed the Board to take a leadership role in achieving positive and continuing affirmative action goals in the state civil service and to establish requirements for improvement or remedial action to eliminate the underutilization of minorities and women in state service. (Stats. 1977, ch. 943, § 1, pp. 2875-2876; Gov. Code, § 19792.)[1]

In an effort to implement the Legislature's goal of a more representative civil service work force, the Board adopted regulations allowing for remedial actions to be taken by state agencies. (Cal. Code of Regs., tit. 2, § 547.30 et seq.) Among the allowable remedial actions is "supplemental certification," which is defined as "the process of augmenting the pool of reachable eligibles on a certification list with additional eligibles who have been identified as substantially underutilized in the classification." (Cal. Code Regs., tit. 2, § 547.31, subd. (g).)[2]

Generally speaking, those applying for civil service positions must sit for a competitive examination. Applicants are ranked according to their performance on the exam. Those who score the highest are ranked accordingly, and only those in the top three ranks may be considered for employment. (Gov. Code, § 19057.1.)

Supplemental certification allows those members of an underutilized class, for present purposes minorities and women, to have their names added to the list of eligible applicants even though the particular minority or female applicant did not score within the top three ranks. The list is then sent to the employing agency, which may select from any of the names on the list. Thus, while supplemental certification does not guarantee that a member of an underutilized class will be selected for employment, it does make minority and female applicants eligible for employment who otherwise could not be considered for employment.

---

[1]The Legislature defined "underutilization" as "having fewer persons of a particular group in an occupation or at a level in a department than would reasonably be expected by their availability." (Gov. Code, § 19791, subd. (c).)

[2]"Where ordered, supplemental certification will be used for any underutilized group where the top three ranks of eligibles available for certification contain fewer than three names from that underutilized group until that group reaches parity or the order is terminated. Additional names from the underutilized group will be certified from successively lower ranks until there are three names from the group, except that all names from the underutilized group in the same rank will be certified at the same time and considered eligible for appointment." (Cal. Code Regs., tit. 2, § 547.33, subd. (d).)

In 1981, the Board conducted a study regarding the hiring practices and representation of the workforce in the Department. The Board found severe underrepresentation of females, minorities (particularly Blacks and Hispanics), and the disabled in the Department's workforce. Severe underrepresentation was also found to exist in the entry level target classes involved in the instant case: fishery biologist, water quality biologist, and fish and wildlife assistant I.

The Department's affirmative action plan, which was submitted to and ultimately approved by the Board, states in relevant part: "A contributing factor to the Department's underrepresentation is the lack of availability for certification of underrepresented groups when vacant positions must be filled. An analysis of the current eligible list composition for key classes indicate [sic] that this is the case. By having supplemental certification for deficient groups in these classes, the certification pool from which selection would take place would be diversified and enhanced and the Department would gain the flexibility necessary to allow it to respond to and meet the affirmative action goals."

"Upon approval of this Agreement by the [Board], the Department shall begin to utilize a '3+3' type supplemental certification procedure for existing eligible lists and eligible lists established subsequently for all underrepresented groups (minorities, females and the disabled). . . .

"[S]upplemental certification shall continue to be utilized for each underrepresented group until such time as the specific group reaches parity in the class of concern.

"The supplemental certification procedures recommended for use are as follows:

"1. The first three names or the first three ranks from the eligible list for the key target class will be certified for consideration for appointment.

"2. In addition, a sufficient number of eligibles [Blacks, Hispanics, females] will be supplementally certified such that a maximum of three names *from each of the underrepresented groups* will also appear on each certification. The need for supplemental certification of particular underrepresented groups will take into consideration members in the first three names or ranks of the standard eligible list.

· "3. These procedures will continue for each underrepresented group until the labor force parity figure for that particular class is met." (Italics in original.)

"[T]he Department agrees to establish the following goals: [¶] At least 60 [percent] of the appointments for target entry-level classes shall be to minorities, females and/or disabled persons. Furthermore, the Department will establish specific goals that assure a balance of minorities, female and disabled persons, including recognition of the need for minority females . . . [¶] (The intent of this goal is to achieve at least six out of ten (60 [percent]) appointments into entry-level classes with underrepresented group members.)"

The Department's affirmative action plan, which allowed for supplemental certification, was approved by the Board in February 1981 and continued in substantially identical form until December 1989, when the Board rescinded from the plan the use of supplemental certification as a remedial measure.

## II

Plaintiffs Edward Swiden, a White male, and William Kidd, a Native American male, applied for positions with the Department. Following a competitive examination, Swiden ranked eighth on the fish and wildlife assistant I list and second on both the fishery biologist and water quality biologist lists. Kidd ranked tenth on the fish and wildlife assistant I list.

Neither Kidd nor Swiden was ever offered a position with the Department, although they alleged, and defendants subsequently admitted, the Department utilized supplemental certification to offer positions to minority and female applicants who ranked below both Kidd and Swiden on the fish and wildlife assistant I list and below Swiden on the fishery biologist list.[3] As a result of being passed over for employment in favor of lesser qualified minority and female applicants, plaintiffs filed the instant suit for declaratory and injunctive relief. Among the issues tendered in plaintiffs' second amended complaint are the following: Supplemental certification violates (1) the equal protection clause of the Fourteenth Amendment to the federal Constitution, (2) the merit principle contained in the state Constitution (art. VII, § 1, subd. (b)), (3) Government Code section 19057.1, which requires appointments to the state civil service be made from the top three ranks of eligible applicants as determined by competitive examination, and (4) Government Code sections 19704 and 19705, which prohibit the appointing power from receiving any data related to an applicant's race or sex. Additionally, plaintiffs' complaint seeks a declaration that all appointments made

---

[3]The Department admitted that pursuant to supplemental certification, it hired for the position of fish and wildlife assistant I two people from both the 11th and 9th ranks, three from the 10th rank, and one each from the 13th, 12th, 8th, 7th, 6th, and 4th ranks. For the position of fishery biologist, the Department admitted using supplemental certification to hire candidates from each of the 14th, 13th, 10th and 6th ranks.

by the Department from the supplemental certification list are void and of no legal effect.

Defendants responded by claiming supplemental certification was consistent with the federal Constitution and not inconsistent with the merit principle set forth in the state Constitution. Additionally, defendants claimed the rule of three ranks set forth in Government Code section 19057.1 must be subordinated to the Legislature's directive that the Board take all necessary action to ensure affirmative action in the state civil service.

Plaintiffs twice moved for summary judgment but on both occasions the motion was denied on the ground plaintiffs had not established that supplemental certification was inconsistent with the federal Constitution. The trial court declined to consider whether plaintiffs' state constitutional or statutory claims might, standing alone, warrant summary judgment in plaintiffs' favor.

While the action was pending in the trial court, the United States Supreme Court decided *Richmond* v. *J. A. Croson Co.* (1989) 488 U.S. 469 [109 S.Ct. 706, 102 L.Ed.2d 854].) *Croson* holds that while state or local government-imposed minority preference plans are constitutionally permissible under limited circumstances, they may not be based on the desirability per se of achieving racial balance or proportional representation of minorities or women in selected institutions. (488 U.S. at p. 498 [109 S.Ct. at p. 724, 102 L.Ed.2d at p. 885].) A state or local government must have strong evidence (i.e., findings) of past discrimination before it can employ racial or gender classifications (488 U.S. at p. 497 [109 S.Ct. at pp. 723-724, 102 L.Ed.2d at p. 884]), and that evidence must approach a prima facie case of a constitutional or statutory violation. (488 U.S. at p. 500 [109 S.Ct. at p. 725, 102 L.Ed.2d at p. 886].)

In light of *Croson*, the Board undertook a reexamination of the Department's affirmative action program "to determine whether the continuation of remedial actions can be justified." A report filed with the Board in March 1989, concluded "there is not evidence of a statistical disparity ᵢbetween protected group representation and those with requisite skills sufficient to trigger remedial actions within the Department of Fish and Game as documented in the [most recent remedial order].)" In December 1989, the Board formally adopted a resolution rescinding the Department's remedial order, thus suspending the Department's use of supplemental certification as a means of achieving racial and gender proportionality within the Department. However, the report upon which the Board based its resolution states: "The [D]epartment's affirmative action progress will be constantly monitored and evaluated. New remedial actions may be recommended as updated representation and examination data become available or as other new information is obtained and evaluated."

Thereafter, defendants moved for judgment on the pleadings, arguing the Board's rescission of the Department's remedial order rendered the action moot. Plaintiffs opposed the motion, urging, inter alia, that because the Board could at any time direct the Department to resume the use of supplemental certification, the primary issue presented, i.e., the validity of supplemental certification, remained unresolved. The trial court agreed with defendants and entered judgment dismissing the action with prejudice. Plaintiffs appealed from the judgment of dismissal.

While the appeal was pending, the voters of this state through the initiative process (Proposition 209) amended the California Constitution to provide, in relevant part, that the State may not discriminate against or grant preferential treatment to any individual on the basis or race or sex "in the operation of public employment[.]" (Cal. Const., art. I, § 31, subd. (a).) Both sides have submitted supplemental briefs on the applicability of this recently enacted constitutional provision to this appeal.

### III

Defendants spend a considerable portion of their brief asserting the trial court was correct in dismissing the action as moot. Defendants note the entire case as framed by the pleadings involves a challenge to the application of supplemental certification to three job classifications in which plaintiffs sought employment. Because the Department's use of supplemental certification has been rescinded, defendants argue the case is moot and there is no valid exception to the policy of dismissal for mootness. We disagree.

The Department has admitted utilizing supplemental certification to offer positions to minority and female applicants who ranked below both Kidd and Swiden on the fish and wildlife assistant I list and below Swiden on the fishery biologist list. Thus, if supplemental certification is violative of the state Constitution or statutes as the complaint alleges, plaintiffs have suffered harm for the redress of which they are entitled to equitable relief. Accordingly, this action is not moot. Plaintiffs are entitled to a determination whether their rights were violated by the use of supplemental certification.

Additionally, the action is not moot because the report to the Board upon which it based its decision to rescind the Department's remedial order expressly reserved the option to reinstitute remedial actions "as updated representation and examination data become available or as other new information is obtained and evaluated." Throughout the proceedings in the trial court, both the Board and the Department defended supplemental certification as an allowable "remedial action," while plaintiffs have claimed

there is nothing to remedy and, more importantly, even if there were, supplemental certification violates both the civil service laws and the merit principle embodied in the state Constitution. Given the Board's express reservation of the option to reinstitute remedial action, plaintiffs' challenge to that policy is not moot.

*Marin County Bd. of Realtors, Inc.* v. *Palsson* (1976) 16 Cal.3d 920 [130 Cal.Rptr. 1, 549 P.2d 833], holds a case does not become moot simply because the defendant discontinues the challenged practice, especially where "there is no assurance that the [defendant] will not reenact it in the future." (16 Cal.3d at p. 929.) In *Cook* v. *Craig* (1976) 55 Cal.App.3d 773 [127 Cal.Rptr. 712], this court warned a "unilateral decision" to change "is also unilaterally rescindable." (55 Cal.App.3d at p. 780.) "[T]he voluntary discontinuance of alleged illegal practices does not remove the pending charges of illegality from the sphere of judicial power or relieve the court of the duty of determining the validity of such charges where by the mere volition of a party the challenged practices may be resumed." (*United States* v. *Insurance Board of Cleveland* (N.D.Ohio 1956) 144 F.Supp. 684, 691, quoted with approval in *Marin County Bd. of Realtors, Inc.* v. *Palsson, supra,* 16 Cal.3d at p. 929.)

There is no assurance that supplemental certification will not be resumed at some point in the future. It is true defendants are no longer using supplemental certification as a means of augmenting the list of eligible candidates for employment with the Department. Nonetheless, the Board's regulations which authorize supplemental certification by the various state agencies as a remedial action (Cal. Code of Regs., tit. 2, §§ 547.31, subd. (g), 547.33, subds. (c), (d)) have *not* been repealed. The Board continues to view supplemental certification as a lawful means of increasing minority and female participation in state employment.

The crux of the instant lawsuit is not limited solely to plaintiffs' challenge to the use of supplemental certification, but is also directed at the Board's power, under whatever name, to authorize the use of race or sex as factors which may properly be considered in selecting applicants for appointment to the civil service. Simply because the Department is not at present using supplemental certification does not render plaintiffs' attack any less viable.

Defendants argue that if the use of supplemental certification is again considered and adopted, they "would have to follow the same formal procedures which were used in adopting and repealing supplemental certification. There would be plenty of opportunity to challenge any such policy at that time in a concrete fashion . . . ."

Plaintiffs sat for competitive examination and were ranked accordingly. When minority and female applicants who ranked lower than plaintiffs were hired for employment, plaintiffs brought suit challenging the use of supplemental certification. Five years later on the eve of trial, and after using supplemental certification to plaintiffs' disadvantage and consistently defending it as both constitutionally and statutorily permissible, the Board rescinded the Department's remedial order. For defendants now to insist that this moots plaintiffs' action challenging supplemental certification is to run a shell game in which the rule of decision (further mixing the metaphor) is "heads, I win, tails you lose."[4]

Nor can defendants deny the issue of supplemental certification is one of significant public importance. *Terry* v. *Civil Service Commission* (1952) 108 Cal.App.2d 861 [240 P.2d 691] involved a challenge to a civil service rule which provided that only graduates of certain designated colleges could take a civil service examination for the position of playground director. Plaintiffs filed suit and a writ of mandate issued directing the commission to allow plaintiffs to take the examination. Before judgment was entered, the exams were graded showing that all of the plaintiffs had failed to receive a passing grade. The commission moved the trial court to dismiss the action as moot because none of the plaintiffs could receive any effective relief. (108 Cal.App.2d at pp. 862-863.) The trial court denied the motion and entered judgment in favor of plaintiffs. (*Ibid.*)

On appeal, the commission again urged the case was moot. The *Terry* court disagreed, holding the case was not moot because the challenged civil service rule was applicable to other positions and future examinations, and was an issue of great public importance to other applicants for civil service positions. (108 Cal.App.2d at p. 872.)

In the instant case, whether the Board may authorize a policy which accords an advantage in hiring to those of a particular race, ethnicity or sex is clearly an issue of the highest public interest. As this court noted recently in *Department of Corrections* v. *State Personnel Bd.* (1997) 59 Cal.App.4th 131 [69 Cal.Rptr.2d 34], "[f]ew issues today stimulate as much debate or are as divisive as affirmative action, particularly the kind that calls for women and certain racial and ethnic minorities to be given preference in employment over White . . . males. [Citations.] Disputes over affirmative action generate a significant amount of litigation. Some of those cases have achieved national notoriety and have further fueled the public debate. [Citations.]

---

[4]Defendants did not move for judgment on the pleadings until five months after the Board's order rescinding the Department's use of supplemental certification.

"The competing views are well known. Proponents argue preferential treatment is justified because of historic societal discrimination against women and certain minorities. Opponents contend preferential treatment unfairly discriminates against nonpreferred individuals, i.e., White . . . males, who are penalized for past societal discrimination for which they are not responsible. [Citations.] After decades of debate and litigation, there is still no public consensus on this very polarizing issue. Preferential treatment based on inherent, immutable personal characteristics remains a particularly volatile political issue of transcendent public concern. [Citation.]" (59 Cal.App.4th at p. 141.)

Inasmuch as the Board has not repealed its regulations allowing for the use of supplemental certification as a viable option in the hiring of state employees, the public interest demands the validity of that policy be decided.

## IV

 Plaintiffs' complaint alleges supplemental certification violates the merit principle embodied in the state Constitution.

Article VII, section 1, subdivision (b) of the state Constitution provides: "In the civil service permanent appointment and promotion shall be made under a general system based on merit ascertained by competitive examination."

Plaintiffs argue that affording applicants for civil service positions an advantage based solely on factors such as sex or race violates this provision, a claim which defendants, remarkably, label as frivolous. Because defendants have been unable to convince us that in this state "merit" is defined by one's sex or by the color of one's skin, we can only conclude plaintiff's claim is *not* frivolous.

*Pacific Legal Foundation* v. *Brown* (1981) 29 Cal.3d 168 [172 Cal.Rptr. 487, 624 P.2d 1215], recounts in detail the adoption by the voters in 1934 of article XXIV (now article VII) of the state Constitution which replaced California's then existing civil service laws with a new scheme based on merit. The court quoted in full the ballot argument in support of the measure which made clear that merit was to be the *sole* criterion for appointment to the state civil service. (29 Cal.3d at pp. 181-184 and fns. 6-8.)

For our purposes, we need only quote a part of the ballot argument: "The purpose of this constitutional amendment is to promote efficiency and

economy in State government. The sole aim of the act is to prohibit appointments and promotion in State service except on the basis of merit, efficiency and fitness *ascertained by competitive examination.* Appointments of inefficient employees for political reasons are thereby prohibited, thus eliminating the 'spoils system' from State employment. . . . [¶] [T]his constitutional amendment provides: (1) Employment in the classified service based solely on merit and efficiency; (2) a nonpartisan Personnel Board; (3) prohibition against exemptions from the merit system of employment; (4) correction of the temporary political appointment evil. [¶] Having by constitutional mandate prohibited employment on any basis except merit and efficiency, thereby eliminating as far as possible the 'spoils system' of employment, the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the State, including the setting up of causes for dismissal such as inefficiency, misconduct or lack of funds." (Ballot Pamp., Proposed Amends. to Cal. Const. with arguments to voters, Gen. Elec. (Nov. 6, 1934), argument in favor of Prop. 7, p. 12, italics added.)

"As this ballot argument demonstrates, the 'sole aim' of the amendment was to establish, as a constitutional mandate, the principle that appointments and promotions in state service be made solely on the basis of merit." (*Pacific Legal Foundation* v. *Brown, supra,* 29 Cal.3d at pp. 183-184.) More recently, in *State Personnel Bd.* v. *Fair Employment & Housing Com.* (1985) 39 Cal.3d 422, 439 [217 Cal.Rptr. 16, 703 P.2d 354], the court reiterated that "nonmerit factors such as race, sex, physical handicap, and the like, play no part in the appointment of civil service employees." Given both the ballot arguments in favor of the initiative and the consistent interpretation of those arguments by our state Supreme Court, it is clear that supplemental certification, which allows the use of "nonmerit factors such as race [and] sex" (39 Cal.3d at p. 439) in the appointment of applicants to the state civil service, violates the merit principle embodied in the state Constitution.

Defendants argue supplemental certification may be upheld as a byproduct of the Board's power via the Legislature to set up laws relating to personnel administration. We disagree. Both the constitutional provision and the ballot argument in favor thereof are remarkably straightforward: The Legislature (and thus the Board via the Legislature) has a free hand with regard to personnel administration *except* that with regard specifically to appointment to service, merit and efficiency shall be the only considerations.[5] The merit principle is sacrosanct; however free the hand of the Legislature, neither that

---

[5]We repeat the relevant part of the ballot argument: "Having by constitutional mandate prohibited employment on any basis except merit and efficiency . . . the Legislature is given a free hand in setting up laws relating to personnel administration for the best interests of the

hand nor the hand of any other branch or agency of government can manipulate the merit principle to serve ends inconsistent with article VII of the state Constitution.

Finally, defendants argue supplemental certification does not violate the merit system because the Board has "complete discretion . . . to appoint anyone to a job who passes the competitive examination for the job." Defendants' argument appears to be that so long as the applicant has passed the competitive examination, the Board should be permitted to appoint that applicant to employment. Thus, if applicant X, a member of a minority, scores 70 percent and is in the 10th rank, and applicant Y, a nonminority, scores 98 percent on the same exam and is ranked first, the Board should have the discretion to appoint X to the position since he did in fact pass the examination. In short, the Board would define merit as nothing more than receiving a passing score on the examination, completely ignoring the fact the examination is to be competitive. Yet, to disregard rankings renders the examination noncompetitive, emasculating the merit principle. Article VII, section 1, subdivision (b) of the state Constitution states that selection to the civil service shall be based on merit and that merit is to be ascertained by competitive examination. The notion that defendants can hire any applicant who passes an examination without consideration of that applicant's standing in relation to others who passed the examination reads the word "competitive" out of the state Constitution.

■ An administrative agency may not adopt a regulation which amends the law it administers or which enlarges or restricts its scope; any such rule is void. (*Agricultural Labor Relations Bd.* v. *Superior Court* (1976) 16 Cal.3d 392, 419-420 [128 Cal.Rptr. 183, 546 P.2d 687].) ■ The Board's supplemental certification regulation injects racial, ethnic and sexual qualifications into a hiring system whose constitutional basis commands that race, ethnicity and sex be disregarded. Because the merit principle is intended to reward merit ascertained by competitive examination, that principle is utterly inconsistent with color blindness for some and color consciousness for others. (Abram, *Affirmative Action: Fair Shakers and Social Engineers* (1986) 99 Harv. L.Rev. 1313, 1319 (hereafter *Abram*).) Accordingly, the Board's supplemental certification regulation must be struck down.

V

■ Plaintiffs argue supplemental certification violates the rule of three ranks set forth in Government Code section 19057.1. This section states that

State . . . ." (Ballot Pamp., *Proposed Amends. to Cal. Const. with argument to voters, Gen. Elec., supra,* argument in favor of Prop. 7, p. 12.)

"for any open employment list, there shall be certified to the appointing power the names and addresses of all those eligibles whose scores, at time of certification, represent the three highest ranks on employment list for the class, and who have indicated their willingness to accept appointment under the conditions of employment specified." Supplemental certification which, following the competitive examination, allows female and minority applicants who do not rank in the three highest ranks nonetheless to have their names considered for employment alongside those who have scored in the three highest ranks, is in clear conflict with Government Code section 19057.1.

The Board defends supplemental certification as authorized by Government Code section 19792, which directs the Board to provide statewide leadership to develop positive and continuing affirmative action programs in the state civil service. (Gov. Code, § 19792, subd. (a).) Defendants argue "Government Code section 19792 provides the Board with the authority to implement affirmative action independent of existing statutory civil service procedures and requirements. That authority was exercised in implementing supplemental certification . . . ." The Board further argues that Government Code section 19792 vests in the Board the authority to "take whatever action is necessary to implement corrective affirmative action within the state civil service."

We find no delegation of authority to the Board in Government Code section 19792 to suspend or ignore existing civil service statutes in order to achieve the affirmative action goals set by the Legislature. To the contrary, uncodified language in the statute of which Government Code section 19792 is a part shows clearly the Legislature's intent that the Board develop rules and regulations implementing the goal of effective affirmative action which zealously promote *equal* opportunity for all Californians regardless of race or sex:

"The Legislature finds and declares that:

"(a) The State of California remains committed to its policy of nondiscrimination and equal employment opportunity and to continuing and expanding positive programs which will assure the strengthening of this policy. To this end the Legislature accepts leadership responsibility for insuring that equal employment opportunities are available to all applicants and employees in all agencies and departments in the state civil service system.

"(b) It is the policy of the Legislature to encourage the state civil service system to utilize to the maximum all available human resources to provide

equal employment opportunity to all persons without regard to race, color, religion, national origin, political affiliation, sex, age, or marital status; and, insofar as possible, to achieve and maintain a work force in which are represented the diverse elements of the population of the State of California.

"(c) Beyond assurances of nondiscrimination, it is the policy of the State of California to have each state hiring unit initiate comprehensive written affirmative action programs which will take steps to remedy any disparate staffing and recruitment patterns.

"(d) This equal employment opportunity policy is adopted to insure that maximum utilization of human resources occurs, that true equality of opportunity is a reality with [sic] the State of California, and that the rights of all employees and applicants are safeguarded." (Stats. 1977, ch. 943, § 1, pp. 2875-2876.)

In addition to its own declaration, the Legislature has enacted various statutes relating to affirmative action. (E.g., Gov. Code, §§ 19400, 19790 et seq., 50085.5; see also §§ 12920-12921.) "It will be noted from a careful study of [these] statutes that the legislative objective is to do everything possible to train, educate, counsel, assist, and encourage members of minorities *to become qualified for* and to accept positions of employment so as to increase their overall participation therein. The key word is 'opportunity' and the focus is upon its continual enlargement. It is noteworthy, however, that with one minor exception, throughout all the legislation on the subject there is nowhere to be found any trace of a statutory undertaking to reject objectively better qualified persons in favor of others less qualified. California does not *officially* countenance such action." *Dawn* v. *State Personnel Board, supra,* 91 Cal.App.3d at pp. 594-595 (conc. opn. of Paras, J.), fn. omitted, italics in original.)

The Legislature's directive was that the Board develop programs along the lines of the original intent of affirmative action—to give minorities and women equal opportunity. (See generally, *Abram, supra,* Harv. L.Rev. at p. 1317.) The Legislature did not intend for the Board to compromise the merit system (which the rule of three ranks is designed to safeguard), but simply to eliminate institutional and informational barriers that inhibit the ability of minorities and females to compete equally with others for jobs in the civil service. (*Abram, supra,* at pp. 1317-1318.)

Supplemental certification is a radical, unwarranted and unlawful departure from the directive given the Board by the Legislature. The relevant provisions in the Government Code simply authorize affirmative action

which is consistent with other civil service laws. Supplemental certification is not. Accordingly, supplemental certification must give way to this paramount state law.

## VI

Plaintiffs also assert supplemental certification violates the provisions of Government Code sections 19704 and 19705, which prohibit the use of race or sex in the hiring process of civil service employees. We agree.

Government Code section 19704 states in relevant part: "It is unlawful to require, permit or suffer any notation or entry to be made upon or in any application, examination paper or other paper, book, document, or record used under this part indicating or in any wise suggesting or pertaining to the race, color, religion, sex, or marital status of any person. Notwithstanding the provisions of this section, subsequent to employment, ethnic, marital status, and gender data may be obtained and maintained for research and statistical purposes . . . *except that in no event shall any notation, entry, or record of such data be made on papers or records relating to the examination, appointment, or promotion of an individual.*" (Italics added.)

Government Code section 19705 states in pertinent part: "Notwithstanding Section 19704, the State Personnel Board may, after public hearing, adopt a system in which applicants for employment in the state civil service shall be asked to provide, voluntarily, ethnic data about themselves where such data is determined by the board to be necessary to an assessment of the ethnic and sex fairness of the selection process and to the planning and monitoring of affirmative action efforts. The board shall provide by rule for safeguards to insure that such data shall not be used in a discriminatory manner in the selection process. . . . *Ethnic data information gathered pursuant to this section on an individual applicant shall not be available to any interviewer or any officer or employee empowered to make or influence the civil service appointment of such individual.*" (Italics added.)[6]

The Department, as the appointing power, admitted it has received the names of those individuals supplementally certified along with notations concerning sex and ethnicity. Additionally, the Board has admitted providing these notations for the Department's use in its hiring decisions.

As was noted in part IV, *ante*, the Board has no power to adopt a rule (here, supplemental certification) which amends the law it administers or

---

[6]Pursuant to this section, the Board adopted a rule designed to insure that sex and race data are not used in the selection process: "Ethnic . . . information on an individual applicant shall not be available to . . . the appointing power or the appointing power's representative prior to the offer of an appointment." (Cal. Code Regs., tit. 2, § 174.8.)

which enlarges or restricts its scope. (*Agricultural Relations Bd.* v. *Superior Court, supra,* 16 Cal.3d at pp. 419-420.) Supplemental certification as applied by the Board is in direct conflict with Government Code sections 19704 and 19705. For all of the reasons set forth in part IV, *ante,* we hold the regulations relating to supplemental certification are void.

## VII

While this appeal was pending, the voters adopted the California Civil Rights Initiative, which appeared on the ballot as Proposition 209 in the November 1996 general election. This initiative measure added section 31 to article I of the state Constitution (hereafter section 31 or Proposition 209).

New California Constitution, article I, section 31, states in relevant part:

"(a) The state shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting.

"(b) This section shall apply only to action taken after the section's effective date.

"(c) Nothing in this section shall be interpreted as prohibiting bona fide qualifications based on sex which are reasonably necessary to the normal operation of public employment, public education, or public contracting.

"(d) Nothing in this section shall be interpreted as invalidating any court order or consent decree which is in force as of the effective date of this section.

"(e) Nothing in this section shall be interpreted as prohibiting action which must be taken to establish or maintain eligibility for any federal program, where ineligibility would result in a loss of federal funds to the state.

"(f) For the purposes of this section, 'state' shall include, but not necessarily be limited to, the state itself, any city, county, city and county, public university system, including the University of California, community college district, school district, special district, or any other political subdivision or governmental instrumentality of or within the state.

"(g) The remedies available for violations of this section shall be the same, regardless of the injured party's race, sex, color, ethnicity, or national

origin, as are otherwise available for violations of then-existing California antidiscrimination law."

█ If there were any question, prior to Proposition 209, whether the California Constitution permitted race and sex preferences to be indulged in public employment, that question has now been answered. Using words "subject to common understanding" (*Lungren* v. *Superior Court* (1996) 48 Cal.App.4th 435, 441 [55 Cal.Rptr.2d 690]), section 31 forbids the state from discriminating against, or giving preferential treatment to, any individual or group on the basis of race or sex "in the operation of public employment . . . ." (Cal. Const., art. I, § 31, subd. (a).) This clear language allows no room for discretionary preferential programs such as supplemental certification.

Nor can there be any dispute the clear intent of the voters was to outlaw preferential programs such as supplemental certification. In the ballot pamphlet, the Legislative Analyst noted: "The measure would eliminate affirmative action programs used to increase hiring and promotion opportunities for state and local government jobs, where sex, race, or ethnicity are preferential factors in hiring, promotion, training, or recruitment decisions." ██ (Ballot Pamp. analysis for Prop. 209 by the Legislative Analyst as presented to the voters, Gen. Elec. (Nov. 5, 1996) p. 31.)[7]

█ Defendants argue that because subdivision (b) of section 31 provides the section applies only to action taken after the effective date of Proposition 209, section 31 has no application to this action. We disagree. It is an established rule of law that on appeal from a judgment granting or denying injunctive relief, the law to be applied is that which is current at the time of the appellate court opinion. (*Kash Enterprises, Inc.* v. *City of Los Angeles* (1977) 19 Cal.3d 294, 306, fn. 6 [138 Cal.Rptr. 53, 562 P.2d 1302].) " 'Relief by injunction operates in futuro, and the right to it must be determined as of the date of decision by an appellate court.' " (*White* v. *Davis* (1975) 13 Cal.3d 757, 773, fn. 8 [120 Cal.Rptr. 94, 533 P.2d 222].) Plaintiffs' action for declaratory and injunctive relief is intended to ensure that supplemental certification, suspended only provisionally by the Board prior to trial, is forever laid to rest. As such, plaintiffs' action seeks relief post-Proposition 209.

█ Defendants also rely on section 31, subdivision (d), which provides that "[n]othing in this section shall be interpreted as invalidating any court

---

[7]On our own motion, we take judicial notice of the ballot pamphlet for Proposition 209. (Evid. Code, § 452, subd. (c).) The ballot pamphlet may properly be considered to show the intent of the voters in passing an initiative measure. (*Pacific Legal Foundation* v. *Brown*, *supra*, 29 Cal.3d 168, 182-183 & fn. 6; *Mobilepark West Homeowners Assn.* v. *Escondido Mobilepark West* (1995) 35 Cal.App.4th 32, 42, fn. 6 [41 Cal.Rptr.2d 393].)

order . . . which is in force as of the effective date of this section." The judgment of the trial court dismissing the action as moot, however, does not qualify as a court order for or against the application of supplemental certification. As such, the judgment is unaffected by section 31, subdivision (d).

Finally, defendants suggest we not apply Proposition 209 in this case, because cases are "pending in state and federal courts in California where the applicability of Proposition 209 to specific employment, contracting and education practices of state agencies is at issue." That actions in which Proposition 209 is implicated are pending in other courts is hardly a legitimate reason to ignore a state constitutional provision unquestionably relevant to this litigation.

In this regard, we note section 31 has already withstood constitutional challenge. *Coalition for Economic Equity* v. *Wilson* (9th Cir. 1997) 122 F.3d 692, certiorari denied __ U.S. __ [118 S.Ct. 397, 139 L.Ed.2d 310] (*Wilson*) concerned an action filed by individuals and groups (plaintiffs) claiming to represent the interests of minorities and women. (122 F.3d at pp. 697-698.) Plaintiffs argued, inter alia, Proposition 209 denied minorities and women equal protection as guaranteed by the Fourteenth Amendment. Plaintiffs sought a declaration that Proposition 209 was unconstitutional, as well as a permanent injunction enjoining California from implementing and enforcing it. (*Ibid.*)

The trial court issued a preliminary injunction. The Ninth Circuit reversed, holding there was "no likelihood of success on the merits of [plaintiffs'] . . . claims . . . ." (122 F.3d at p. 710.)

In addressing the plaintiffs' equal protection claims, the *Wilson* court had this to say: "As a matter of 'conventional' equal protection analysis, there is simply no doubt that Proposition 209 is constitutional. . . . [¶] The ultimate goal of the Equal Protection Clause is 'to do away with all governmentally imposed discrimination based on race.' [Citation.]. . . . [¶] The standard of review under the Equal Protection Clause does not depend on the race or gender of those burdened or benefited by a particular classification. [Citation.] When the government prefers individuals on account of their race or gender, it correspondingly disadvantages individuals who fortuitously belong to another race or to the other gender. . . . Proposition 209 amends the California Constitution simply to prohibit state discrimination against or preferential treatment to any person on account of race or gender. Plaintiffs charge that this ban on unequal treatment denies members of certain races and one gender equal protection of the laws. *If*

*merely stating this alleged equal protection violation does not suffice to refute it, the central tenet of the Equal Protection Clause teeters on the brink of incoherence.*" (122 F.3d at pp. 701-702, italics added.)

The *Wilson* court continued: "The first step in determining whether a law violates the Equal Protection Clause is to identify the classification that it draws. Proposition 209 provides that the State of California shall not discriminate against, or grant preferential treatment to, any individual or group on the basis of race or gender. Rather than classifying individuals by race or gender, Proposition 209 *prohibits* the State from classifying individuals by race or gender. A law that prohibits the State from classifying individuals by race or gender *a fortiori* does not classify individuals by race or gender. Proposition 209's ban on race and gender preferences, as a matter of law and logic, does not violate the Equal Protection Clause in any conventional sense." (122 F.3d at p. 702, italics in original.)

"Plaintiffs challenge Proposition 209 not as an impediment to protection against unequal treatment but as an impediment to receiving preferential treatment. The controlling words, we must remember, are 'equal' and 'protection.' Impediments to preferential treatment do not deny equal protection. It is one thing to say that individuals have equal protection rights against political obstructions to equal treatment; it is quite another to say that individuals have equal protection rights against political obstructions to preferential treatment. While the Constitution protects against obstructions to equal treatment, it erects obstructions to preferential treatment by its own terms." (122 F.3d at p. 708, fn. omitted.)

The court concluded its equal protection analysis as follows: "That the Constitution *permits* the rare race-based or gender-based preference hardly implies that the state cannot ban them altogether. States are free to make or not make any constitutionally permissible legislative classification. Nothing in the Constitution suggests the anomalous and bizarre result that preferences based on the most suspect and presumptively unconstitutional classifications—race and gender—must be readily available at the lowest level of government while preferences based on another presumptively legitimate classification—such as wealth, age or disability—are at the mercy of statewide referenda.

". . . . . . . . . . . . . . . . . . . . . . . . . . .

"The Constitution permits the people to grant a narrowly tailored racial preference only if they come forward with a compelling interest to back it up. [Citation.] '[I]n the context of a Fourteenth Amendment challenge,

courts must bear in mind the difference between what the law permits, and what it requires.' [Citation.] To hold that a democratically elected affirmative action program is constitutionally permissible because the people have demonstrated a compelling state interest is hardly to hold that the program is constitutionally required. The Fourteenth Amendment, lest we lose sight of the forest for the trees, does not require what it barely permits." (122 F.3d at pp. 708-709, italics in original.)

The constitutionality of Proposition 209 aside, defendants' supplemental brief is remarkable in that it completely fails to address the question whether subdivision (a) of section 31 precludes the use of programs such as supplemental certification. Thus to the extent the argued exceptions to section 31 (subds. (b), (d)) are inapplicable here, defendants do not attempt to demonstrate that section 31 does not forbid race and sex based preference programs such as supplemental certification.

## VIII

▮▮▮ Supplemental certification violates the California Constitution and statutes.[8] By utilizing supplemental certification to offer positions to minority and female applicants who ranked below both Kidd and Swiden, the defendants violated plaintiffs' constitutional and statutory rights entitling them to redress in the nature of equitable relief.

We reject, however, plaintiffs' request that such redress includes an order requiring defendants to discharge from employment those hired pursuant to supplemental certification. We so hold for three reasons.

First, plaintiffs abandoned their request at oral argument in this court. Second, the record fails to establish that those hired through supplemental certification have been joined in this action. Although references in certain documents might support a contrary inference, not a single proof of service is included in the record before this court. Nor is there anything in the record showing these unnamed and apparently unserved parties had on opportunity to participate in this appeal. Stated simply, this court has no power to adjudicate the rights of those not parties to the action.

Third, we do not believe that removal of persons appointed pursuant to an illegal selective certification program is a proper remedy in a reverse discrimination case. In *San Francisco Police Officers* v. *San Francisco* (9th

---

[8]Because we hold supplemental certification is in violation of the state Constitution and statutes, we need not address plaintiffs' claim supplemental certification is also violative of the equal protection clause of the Fourteenth Amendment to the federal Constitution.

Cir. 1989) 869 F.2d 1182, plaintiffs sought a similar remedy, which was rejected out-of-hand: "One possible relief would be to order the City to discharge those who were illegally promoted and open up the jobs to a new and fair examination. This solution is precluded by the precedents governing equitable relief where there has been discrimination. The beneficiaries of the revision did not cause the City to do what it did. It would be inequitable to penalize them by ousting them from their positions." (869 F.2d at p. 1184.)

The judgment is reversed. On remand, the trial court is directed to vacate its order granting defendants' motion for judgment on the pleadings, enter an order denying defendants' motion, declare plaintiffs' rights were violated by the use of supplemental certification and that supplemental certification is void as violative of the state Constitution and statutes, enjoin defendants from using supplemental certification and fashion an equitable remedy to redress the violation of plaintiffs' constitutional and statutory rights. Plaintiffs shall recover costs on appeal.[9]

Sims, J., and Morrison, J., concurred.

---

[9]Plaintiffs' and defendants' motions for judicial notice are denied.