Filed 8/2/16  Coral Construction v. City and County of San Francisco CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| CORAL CONSTRUCTION, INC., et al.,<br><br>        Plaintiffs and Appellants,<br><br>v.<br><br>CITY AND COUNTY OF SAN FRANCISCO, et al.,<br><br>        Defendants and Respondents. | A138901<br><br>(County of San Francisco<br>Nos. 319549 & 421249) |

This litigation began over a decade ago when, in 2001, Coral Construction, Inc. (Coral) filed a complaint against the City and County of San Francisco and various other related parties (collectively, the City), alleging that a City ordinance mandating race- and gender-based preferences in public contracting violated Proposition 209, codified in section 31 of article I of the California Constitution.  Since that time, the matter has spawned two appellate court decisions and an opinion from the California Supreme Court. (See *Coral Construction, Inc. v. City and County of San Francisco* (2007) 149 Cal.App.4th 1218 (*Coral II*), review granted and opn. superseded by *Coral Construction, Inc. v. City and County of San Francisco* (2010) 50 Cal.4th 315 (*Coral Construction*); *Coral Construction, Inc. v. City and County of San Francisco* (2004) 116 Cal.App.4th 6 (*Coral I*).)  Most recently, the Supreme Court remanded the case to the trial court for further proceedings to determine the constitutionality of the challenged ordinance in accordance with the analytical framework set forth in its opinion.  (*Coral Construction*, *supra*, 50 Cal.4th at pp. 335-338.)  Instead, the trial court—noting that the ordinance at

issue had since been repealed—concluded that "it is now speculative to say that the City will enact race-or gender-conscious legislation in the future" and therefore dismissed the litigation as moot. Because we agree with the trial court that no justiciable controversy remains, we affirm.

## I. BACKGROUND

### A. *The Early Ordinances, Proposition 209, and the Commencement of this Action*

Between 1984 and 2004 (when its continued enforcement was enjoined), the City operated under several iterations of its Minority/Women/Local Business Utilization Ordinance (Ordinance). In its various forms, the Ordinance called for race- and gender-conscious remedies to ameliorate the effects of past discrimination on minority-owned business enterprises (MBE's) and women-owned business enterprises (WBE's) in the awarding of City contracts. (*Coral II*, *supra*, 149 Cal.App.4th at p. 1225.) In *Coral Construction*, the Supreme Court admirably summarized the early history of the Ordinance and related developments in the law of preferences as follows:

"The City's first MBE/WBE ordinance, adopted in 1984, set aside specified percentages of public contracting dollars for MBE's and WBE's. The ordinance also gave bid discounts, which required the City's contracting authorities to treat bids by MBE's and WBE's as if they were lower than they in fact were. Both the set-asides and the bid discounts afforded MBE's and WBE's a competitive advantage over other bidders.

"In 1989, the United States Court of Appeals for the Ninth Circuit held the City's 1984 ordinance violated the federal equal protection clause (U.S. Const., 14th Amend.) in giving preferences based on race, and that it also violated the City's own charter in several respects. (*Associated General Contractors of California v. City & County of San Francisco* (9th Cir. 1987) 813 F.2d 922, 944.) Shortly thereafter, the United States Supreme Court determined that Richmond, Virginia's MBE set-asides violated equal protection. (*City of Richmond v. J. A. Croson Co.* (1989) 488 U.S. 469, 498-506 [102 L.Ed. 2d 854, 109 S. Ct. 706] (*Croson*).) The legislative findings supporting Richmond's program did not show the requisite ' "strong basis in evidence for [the city's] conclusion

2

that remedial action was necessary." ' (*Id.*, at p. 500, quoting *Wygant v. Jackson Board of Education* (1986) 476 U.S. 267, 277 [90 L. Ed. 2d 260, 106 S. Ct. 1842] (plur. opn. of Powell, J.).) Four justices suggested, however, that in 'the extreme case' not presented in *Croson,* 'some form of narrowly tailored racial preference might be necessary' as a remedy 'to break down patterns of deliberate exclusion.' (*Croson*, at p. 509 (plur. opn. of O'Connor, J.).)

"Responding to these judicial decisions, San Francisco's Board in 1989 passed a new ordinance eliminating set-asides but retaining bid discounts and other preferences for MBE's and WBE's. When an organization of businesses sued to enjoin the ordinance's enforcement, the City argued the equal protection clause required preferences as a remedy for discrimination. The federal district court declined to issue interim relief because the plaintiffs had failed to demonstrate a sufficient likelihood of success on the merits. (*Associated General Contractors v. San Francisco* (N.D.Cal. 1990) 748 F. Supp. 1443, 1456.) The Ninth Circuit affirmed. (*Associated General Contractors of California v. Coalition* (9th Cir. 1991) 950 F.2d 1401, 1418.)" (*Coral Construction*, *supra*, 50 Cal.4th at pp. 320-321.)[1]

Thereafter, effective November 6, 1996, the California electorate adopted Proposition 209, the California Civil Rights Initiative, adding article I, section 31, to the California Constitution (section 31). (Cal. Const., art. I, § 31; *Coral II*, *supra*, 149 Cal.App.4th at p. 1225.) Section 31 prohibits state and local governments from discriminating against, or granting preferential treatment to, "any individual or group on the basis of race, sex, color, ethnicity, or national origin in the operation of public employment, public education, or public contracting." (Cal. Const., art I, § 31, subds. (a) & (f).) Certain actions, however, are exempted from the mandate of section 31. (*Id.*, subds. (b)-(e).) Thus, for instance, the legislation does not apply if the action at issue is

---

[1] Specifically, the Ninth Circuit concluded that the City was "likely to demonstrate a '*strong basis in evidence*' supporting its decision to adopt a race-conscious plan" [citation] and that the Ordinance was narrowly tailored to redress the consequences of discrimination [citation]." (*Coral II*, *supra*, 149 Cal.App.4th at p. 1227, italics added.)

3

required to maintain eligibility for federal funds. (*Id.*, subd. (e).) Further, the statute also contains a standard savings clause, which provides that "[i]f any part or parts of this section are found to be in conflict with federal law or the United States Constitution, the section shall be implemented to the maximum extent that federal law and the United States Constitution permit." (*Id.*, subd. (h).) Under this language, if race- or gender-conscious remedies are *required* under the federal equal protection clause to remedy intentional discrimination, they would be exempted from the strictures of section 31. (See *Hi-Voltage Wire Works, Inc. v. City of San Jose* (2000) 24 Cal.4th 537, 567 (*High-Voltage*).)

Events impacting the Ordinance in the wake of Proposition 209 were summarized by the *Coral Construction* Court as follows:

"At the time the voters adopted section 31, the MBE/WBE ordinance then in effect was set to expire on October 31, 1998. Before the ordinance expired, the City's Board and its Human Rights Commission (HRC) conducted investigations for the stated purpose of 'gaug[ing] the effectiveness of the prior [MBE/WBE] Ordinances . . . and to assess the need for further and continuing action.' (S.F. Admin. Code, former § 12D.A.2.) The Board found that MBE's and WBE's were receiving a smaller share of City contracts than would be expected based on their availability, and that '[t]his poor utilization [could not] be attributed to chance' and was, instead, 'due to discrimination by the City and discrimination in the private market.' (S.F. Admin. Code, former § 12D.A.2.2.) In legislative findings setting out the basis for this conclusion, the Board cited its own statistical studies, similar studies by other governmental entities in the San Francisco Bay Area, testimony and oral histories recounting anecdotes of discrimination, 'social science materials concerning discrimination against women and minorities in the Bay Area and in public contracting,' and data showing that 'the decision makers in the City contracting process—the City department heads and general and deputy managers— have been and continue to be overwhelmingly Caucasian males' operating under an ' "old boy network." ' (S.F. Admin. Code, former § 12.D.A.2 (findings 1, 15).)

"Based on these findings, the Board in 1998 adopted a new ordinance preserving

4

bid discounts for MBE's and WBE's, and requiring prime contractors either to use MBE and WBE subcontractors at levels set by the HRC or to make good faith efforts to do so through preferential outreach efforts targeted at such businesses. (S.F. Admin. Code, former §§ 12D.A.4, 12D.A.5, 12D.A.17.)

"In 2000, while San Francisco's 1998 ordinance was still in effect, we held that section 31 invalidated the City of San Jose's public contracting program because it mandated participation goals for, and preferential outreach efforts directed to, MBE's and WBE's. (*Hi-Voltage*, *supra*, 24 Cal.4th 537, 562–565.) Section 31 does not tolerate, we explained, race- and gender-conscious preferences the equal protection clause does not *require* but merely *permits*. (See *Hi-Voltage*, at p. 567.) Like the plurality in *Croson*, *supra*, 488 U.S. 469, however, we held out the possibility that the federal equal protection clause might sometimes require race-conscious remedies to remedy intentional discrimination. (*Hi-Voltage*, at p. 568 ['Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury.']; see *Croson*, at p. 509 (plur. opn. of O'Connor, J.).)

"In 2001, plaintiff Coral commenced the action now before us in the San Francisco Superior Court, seeking declaratory and injunctive relief against the 1998 ordinance. The ordinance was set to expire in 2003. (S.F. Admin. Code, former § 12D.A.21.) Before it expired, and while plaintiff's action proceeded in the superior court, the City conducted additional investigations to determine whether discrimination against MBE's and WBE's continued. Finding that such discrimination did continue, the Board in 2003 reenacted the 1998 ordinance without substantial change. (See S.F. Admin. Code, § 12D.A.2.8.) From that point on, the action proceeded as a challenge to the 2003 ordinance.

"In legislative findings accompanying the 2003 ordinance, the Board once again relied on statistical studies showing that MBE's and WBE's were underutilized, both in San Francisco and the surrounding area, on testimony and oral histories recounting anecdotes of discrimination, and on social science materials. (S.F. Admin. Code,

5

§ 12D.A.2.)  Based on this information, the Board found that 'the race- and gender-conscious remedial programs authorized by [the MBE/WBE] Ordinance continue to be necessary to remedy discrimination against minority- and women-owned businesses in City prime contracting and subcontracting.'  (S.F. Admin. Code, § 12D.A.2.8.)  The Board also found 'that the City . . . is actively discriminating against women and minority groups in its contracting, and is passively participating in discrimination in the private sector.'  (*Ibid.*)  In conclusion, the Board found 'that the evidence before it establishes that the City's current contracting practices are in violation of federal law and that, as a result, [the] ordinance continues to be required by federal law to bring the City into compliance with federal civil rights laws in its contracting practices.'  (*Ibid.*)

"More specifically, the Board found that 'the following discriminatory practices [identified by the HRC in 1998 were still] at work in City contracting: (1) listing [MBE's and WBE's] as subcontractors but never using the listed [MBE and WBE] subcontracting firms, (2) the use of additional nonminority, male subcontractors never listed on the relevant HRC forms, and (3) the creation of fraudulent joint ventures involving minority- or women-owned and majority, men-owned firms.'  (S.F. Admin. Code, § 12D.A.2.7.) The Board also noted the HRC in 2003 'ha[d] encountered . . . additional discriminatory practices in City contracting,' including: '(1) attempts by City personnel to improperly influence contract selection panels to ensure that MBEs/WBEs do not obtain City prime contracts; (2) attempts by City personnel to blame MBEs/WBEs unjustifiably for project delays; (3) the imposition of unnecessary minimum requirements on City contracts that act as a barrier to MBEs/WBEs; (4) the failure by City departments to submit draft requests for proposals to HRC with sufficient time to permit the HRC to ensure that adequate MBE/WBE subcontracting goals have been set; (5) attempts by City departments to circumvent the requirements of [the 1998] ordinance by extending or modifying existing contracts rather than putting new contracts out to bid; (6) the failure by City departments to comply with the prompt payment provisions of this ordinance which ensure that MBEs/WBEs do not suffer unnecessary financial hardships; and (7) resistance by City prime contractors to provid[ing] the City with required subcontractor

6

payment information, making it difficult for the City to ensure that MBE/WBE subcontractors receive prompt payment for their work on City contracts.' (*Ibid.*)

"The City's 2003 statistical studies showed that MBE's and WBE's continued 'to receive a smaller share of certain types of contracts for the purchases of goods and services by the City than would be expected' based on their availability. (S.F. Admin. Code, § 12.D.A.2.3.) The studies also showed, however, that MBE's and WBE's received a larger share of other types of contracts. To note just a few examples, the City used African-American MBE's at 10 times, and WBE's at more than three times, the expected rate for professional services subcontracts, and used Latino MBE's at more than twice the expected rate for construction prime and subcontracts. (S.F. Admin. Code, §§ 12D.A.2.4, 12D.A.2.5.) The Board explained its overuse of MBE's and WBE's as 'attributable to the fact that the City has remedial contracting programs in place,' and found that to discontinue the use of preferences would cause MBE and WBE utilization rates to 'plummet.' (*Id.*, § 12D.A.2.4.) In comparison, non-MBE/WBE firms were slightly overused in most areas of City contracting, significantly overused in a few areas, and substantially overused only in prime contracts for architecture and engineering (by 40 percent) and prime and subcontracts for telecommunications (by 10 and 23 percent, respectively).

"In contrast to 1998, the Board in 2003 no longer found that decision makers in the City's contracting process were overwhelmingly Caucasian males. (Compare S.F. Admin. Code, former § 12D.A.2.1 with *id.*, present § 12D.A.2 [deleting the prior finding].) The Board noted, however, that '[m]inorities and women [had] report[ed] that project managers in many City Departments continue to operate under an "old boy network["] in awarding City prime contracts.' (*Id.*, § 12D.A.2.6.)" (*Coral Construction*, *supra*, 50 Cal.4th at pp. 321-324, footnote omitted.)

B.      *The Trial Court's Initial Decision and Our Opinions in Coral I and Coral II*

While the City went through the process of marshalling the evidence necessary to support the continued use of race- and gender-conscious preferences in public contracting and the adoption of the 2003 iteration of its Ordinance, Coral's litigation contesting the

7

constitutionality of the Ordinance continued. Specifically, the City successfully challenged Coral's standing in the trial court by arguing, in the context of a motion for summary judgment, that Coral had failed to prove it would be bidding on an identifiable City contract subject to the Ordinance in the reasonably near future. (*Coral I*, *supra*, 116 Cal.App.4th at p. 10.) Thus, it could not show the "actual or imminent" injury necessary to confer standing. (*Id.* at pp. 14, 17-19.) On appeal in *Coral I*, we rejected the trial court's reasoning, concluding instead that in order to show actual or imminent injury under these circumstances a party need only show that " 'it has bid in the past and would continue to bid in the future.' " (*Id.* at p. 24.) We therefore reversed and remanded the matter to the trial court for further proceedings.[2] (*Id.* at p. 28.)

In the meantime, after the City adopted the 2003 Ordinance, Schram Construction, Inc. (Schram) also commenced an action challenging the statute's constitutionality under section 31 and seeking declaratory and injunctive relief. (See *Coral Construction*, *supra*, 50 Cal.4th at p. 325; *Coral II*, *supra*, 149 Cal.App.4th at p. 1225, fn.1.) After Schram and the City filed and briefed cross-motions for summary judgment, the Coral parties (on remand) joined in the motions, and all parties in both cases agreed that the trial court could rule on summary judgment in both the Coral and the Schram matters based on the existing record and briefings. As a consequence, the trial court consolidated the two cases for all purposes. (*Coral Construction*, *supra*, 50 Cal.4th at p. 325.)

Ultimately, the trial court granted the motion for summary judgment advanced by Coral and Schram (collectively, plaintiffs) and denied the City's contrary motion. In particular, the trial court struck down the Ordinance as violative of section 31, rejecting the City's counter-arguments that: (1) section 31 is preempted by the International Convention on the Elimination of All Forms of Racial Discrimination (Race Convention), a human rights treaty ratified by Congress in 1994; (2) section 31 offends the political

---

[2] In doing so, we rejected the parties' request that we address the constitutionality of the Ordinance ourselves as a legal matter. As our review of the record made clear, this was not the type of issue that could be "decided in the first instance on this appeal." (*Coral I*, *supra*, 116 Cal.App.4th at p. 27.)

restructuring arm of equal protection jurisprudence as articulated in *Hunter v. Erickson* (1969) 393 U.S. 385 and *Washington v. Seattle School Dist. No. 1* (1982) 458 U.S. 457 (the political structure doctrine) and (3) given the City's pervasive past discrimination in public contracting, the Ordinance was a remedial measure required by the federal equal protection clause and thus exempt from the mandate of section 31.  (*Coral II*, *supra*, 149 Cal.App.4th at p. 1225 & fn. 2.)  In line with its reasoning, the court, as relief, entered a permanent injunction prohibiting the City from enforcing the 2003 Ordinance or any "substantially similar" program in the future (Permanent Injunction).[3]  (*Coral Construction*, *supra*, 50 Cal.4th at p. 325.)

On appeal, we endorsed the trial court's conclusions that the Ordinance was not preempted by the Race Convention and did not offend the political structure doctrine. We also held that the Ordinance was not required in order to maintain the City's eligibility for federal funds and therefore was not exempt from the requirements of section 31 on that basis.  (*Coral II*, *supra*, 149 Cal.App.4th at p. 1226.)  We were concerned, however, that the trial court improperly sidestepped the issue of whether the federal equal protection clause trumped section 31.  (*Ibid*.)

In fact, although it acknowledged the City's argument that the Ordinance was required by the federal equal protection clause, the trial court failed to determine the issue, stating instead:  "The intent of the voters in adopting Proposition 209 was to outlaw race- and sex-based programs irrespective of the good will and moral position behind any particular program.  The Ballot Pamphlet for Proposition 209 provides ample evidence

---

[3] The Permanent Injunction provided as follows:  "[City] shall cease and desist from, and are permanently enjoined and prohibited from, enforcing or attempting to enforce, directly or indirectly, except as exempted by Article 1, Section 31(e) of the California Constitution, Sections 12.D.A.6, 12.D.A.7, 12.D.A.8, 12.D.A.9, 12.D.A.10, 12.D.A.14, and 12.D.A.17 of the Administrative Code of the City and County of San Francisco, which discriminate against or grant preferential treatment to individuals or groups on the basis of race, sex, color, ethnicity or national origin in the operation of public contracting. The City is further enjoined from enforcing or attempting to enforce the race, sex, color, ethnicity or national origin preferential provisions of any ordinance enacted after July 26, 2004, to the extent that those provisions are the same as or substantially similar to the provisions of Chapter 12.D.A. that are enjoined herein."

9

that the voters acted with the intention to abolish any type of race- and sex-conscious program adopted by the City, regardless of its genesis. [Citation.] And nobody argues that Proposition 209 carved out an exception based on the concededly good intentions of the City when it created this remedial program." (*Coral II*, *supra*, 149 Cal.App.4th at p. 1246, quoting trial court.) Noting that the issue had never been "whether section 31 could invalidate remedial efforts based on good intentions," we concluded that, given the supremacy of federal constitutional principles, the trial court "had no option but to engage in the appropriate analysis to determine whether *the legislative history and supporting documents* sustained the City's claim of discrimination in public contracting and, if so, whether the City had a constitutional obligation to remedy this history by implementing and administering the Ordinance." (*Id.* at p. 1247, italics added.) Since the trial court had "declined to decide whether the City presented the extreme case of intentional discrimination in public contracting in San Francisco such that a narrowly tailored remedial preference program could be constitutionally required," we remanded the case for the limited purpose of determining this issue. (*Id.* at p. 1250.)

C.     *The Supreme Court Opinion*

Thereafter, plaintiffs filed a petition for review of *Coral II* in the Supreme Court, and the Court ultimately granted review to consider three issues: (1) Does section 31 improperly disadvantage minority groups and violate equal protection principles by making it more difficult to enact legislation on their behalf in violation of the political structure doctrine? (2) Does an ordinance like the one at issue fall within an exception to section 31 for actions required of a local government entity to maintain eligibility for federal funds under the federal Civil Rights Act (42 U.S.C. § 2000d)? and (3) Did this court properly remand the case to the trial court to determine in the first instance whether the Ordinance was required by the federal equal protection clause as a narrowly tailored remedial program to remedy ongoing, pervasive discrimination in public contracting (the federal compulsion argument)? (See *Coral Construction v. City of San Francisco* (Sept. 12, 2007) 2007 Cal. LEXIS 9690; see also *Coral Construction*, *supra*, 50 Cal.4th at pp. 326 & fn.5, 333 & fn.13, 335 & fn. 17.) The high court ultimately affirmed our decision

10

in *Coral II* on all grounds, concluding that the political structure doctrine did not invalidate section 31; that the federal funding exception set forth in section 31 did not exempt the 2003 Ordinance from the statute's general prohibition of racial and gender preferences; and that remand was appropriate for the trial court to consider the City's federal compulsion argument. (*Coral Construction*, *supra*, 50 Cal.4th at pp. 332, 335.)

With respect to remand on the federal compulsion issue, the Court offered the following comments: "While the parties have not brought to our attention any decision ordering a governmental entity to adopt race-conscious public contracting policies under the compulsion of the federal equal protection clause, the relevant decisions hold open the possibility that race-conscious measures might be required as a remedy for purposeful discrimination in public contracting. (*Hi-Voltage, supra*, 24 Cal.4th 537, 568 ['Where the state or a political subdivision has intentionally discriminated, use of a race-conscious or race-specific remedy necessarily follows as the only, or at least the most likely, means of rectifying the resulting injury.']; see also *Croson, supra*, 488 U.S. 469, 509 (plur. opn. of O'Connor, J.) ['In the extreme case, some form of narrowly tailored racial preference might be necessary to break down patterns of deliberate exclusion.'].)" (*Coral Construction*, *supra*, 50 Cal.4th at p. 337.) In addition, the Court stressed that the racial classifications in this case are subject to strict scrutiny and thus " 'are constitutional only if they are narrowly tailored measures that further compelling governmental interests.' " (*Ibid.*) Moreover, the Court concluded that "[t]he only possibly compelling governmental interest implicated by the facts of this case is the interest in providing a remedy for purposeful discrimination." (*Ibid.*)

The Supreme Court noted that it had the power to decide the federal compulsion issue in the first instance. It declined, however, to exercise this power because "the federal compulsion claim is *largely factual and depends on the evidence supporting the Board's decision to adopt race-conscious legislation*. When the government seeks to defend actions based on race as remedial, there must be 'a "strong basis in evidence for its conclusion that remedial action was necessary." ' " (*Coral Construction*, *supra*, 50 Cal.4th at p. 336, italics added.) The Supreme Court expected the trial court's assessment

11

of the record to "assist the reviewing courts, if necessary, in determining whether a strong basis in the evidence does in fact support the City's decision to adopt the 2003 ordinance." (*Ibid.*)

To aid the trial court on remand, the high court articulated a four-part test for determining whether the City could defeat plaintiffs' summary judgment motion. Specifically, the Court opined that "the City must show that triable issues of fact exist on each of the factual predicates for its federal compulsion claim, namely (1) that the City has purposefully or intentionally discriminated against MBE's and WBE's; (2) that the purpose of the City's 2003 ordinance is to provide a remedy for such discrimination; (3) that the ordinance is narrowly tailored to achieve that purpose; and (4) that a race- and gender-conscious remedy is necessary as the only, or at least the most likely, means of rectifying the resulting injury." (*Coral Construction*, *supra*, 50 Cal.4th at pp. 337-338.) Since the parties had previously stipulated that no further development of the record was necessary, the Supreme Court remanded the case for the trial court to consider the federal compulsion issue based on the existing record. (*Id.* at p. 338.)

**D.**   ***Subsequent Ordinance Changes***

While this matter was pending before the Supreme Court, the 2003 Ordinance expired by its own terms on June 30, 2008. (See S.F. Admin. Code, former § 12D.A.2.22, as amended effective June 1, 2003.) However, on July 11, 2008, the City enacted legislation providing that if the Permanent Injunction was ever lifted, the 2003 Ordinance would again take effect 120 days later and would remain in effect until one year after the lifting of the Permanent Injunction.[4] (See S.F. Admin. Code, former § 12D.A.2.22, as amended effective July 11, 2008.) Thereafter, in October 2012 while this case was on remand from the Supreme Court, the City enacted legislation repealing

---

[4] The Supreme Court acknowledged the expiration of the 2003 Ordinance, but declined to dismiss the matter as moot because no party had requested dismissal, "because the injunction bars the City from adopting any similar ordinance in the future, and because there is no reason to believe the City would not, but for the injunction, renew its long-standing mandate for race- and gender-based preferences." (*Coral Construction*, *supra*, 50 Cal.4th at p. 326, fn. 4.)

the 2008 provisions extending the expiration date of the 2003 Ordinance, effectively repealing it. (City and County of San Francisco Ordinance No. 220-12, effective Oct. 23, 2012.) In the meantime, the City—enjoined from using the 2003 Ordinance to direct its public contracting decisions—had adopted alternate legislation in 2006 (2006 Ordinance) which instituted race- and gender-neutral public contracting procedures. (S.F. Admin. Code Chapter 14B.) Thus, when this case was decided by the trial court on remand in 2013, the only public contracting statute in effect was the 2006 Ordinance, and that race- and gender-neutral statute had been operative in the City for the last seven years.

**E.** *The Trial Court Decision on Remand*

In the wake of the Supreme Court's remand order in *Coral Construction*, the parties filed cross-motions for summary judgment on the federal compulsion issue.[5] Both pleadings argued at length—under the analytical framework adopted by the Supreme Court in *Coral Construction*—the sufficiency of the factual evidence marshaled by the City to support its adoption of the 2003 Ordinance as "a race-conscious or race-specific remedy" that was "the only, or at least the most likely, means of rectifying" past discrimination. (See *Hi-Voltage, supra*, 24 Cal.4th at p. 568.) In the alternative, the City argued that the Permanent Injunction was overbroad and requested that it be modified.

During this same timeframe, the City initiated legislation repealing the provisions extending the expiration date of the 2003 Ordinance. Based on this legislative action, it also filed a separate motion for judgment on the pleadings, arguing that the litigation should be dismissed as moot and the Permanent Injunction dissolved. After briefing and argument, the trial court agreed with the City and, by its May 2013 order, granted the City's motion for judgment on the pleadings, dissolved the Permanent Injunction, and

---

[5] On January 31, 2014, plaintiffs filed a request for judicial notice in connection with this appeal. The City filed opposition on February 18, 2014, to which plaintiffs replied on February 20, 2014. By order dated February 26, 2014, we stated our intention to decide the request with the merits of the appeal. We hereby grant plaintiffs' request, and will consider the materials—various pleadings filed in the trial court during the pendency of this action—in the rendering of our decision in this matter. (Evid. Code, § 452, subds. (d)(1) & (h).)

dismissed the matter as moot. In particular, the court found that the Permanent Injunction was no longer necessary because the City's legislative action finally terminating the 2003 Ordinance made it "speculative" to say that the City would enact race- or gender-conscious legislation in the future. Moreover, if the City did enact future legislation believed to be unconstitutional, any affected party could seek relief from that legislation in the courts. The trial court also found the language of the Permanent Injunction overbroad.

With respect to mootness, the trial court concluded that, because plaintiffs were already free from any enforcement of the Ordinance, the injury they claimed at the commencement of the case—"an uneven playing field because of the City's race and gender preferences in public contracting"—was no longer present. Moreover, the court declined to keep the controversy alive through maintenance of the Permanent Injunction because (1) it was unwilling to use an injunction to control future legislative acts; (2) such an injunction might confer standing on plaintiffs regardless of whether they were actually injured by any future legislation; and (3) if new race- or gender-conscious legislation was ever again enacted by the City, the courts would have to determine its constitutionality under the federal compulsion argument in some way. The court saw "no benefit to adjudicating that issue in a motion to enforce an injunction rather than a new lawsuit." Given this outcome, the trial court also denied as moot the parties' cross-motions for summary judgment and the City's motion to modify the Permanent Injunction. Plaintiffs' timely notice of appeal brought the matter before this court.[6]

## II. MOOTNESS

**A.** *Legal Framework and Standard of Review*

As a general rule, " 'the duty of this court, as of every other judicial tribunal, is to decide actual controversies by a judgment which can be carried into effect, and not to

---

[6] Prior to oral argument, we were informed by counsel for Coral that Schram shut down it's business at the end of 2015 and thus no longer has standing to pursue this matter. We agree with Coral that this changed circumstance has no bearing on our resolution of the case.

give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it.' " (*Eye Dog Foundation v. State Board of Guide Dogs for the Blind* (1967) 67 Cal.2d 536, 541 (*Eye Dog Foundation*).) Thus, an " 'action that originally was based on a justiciable controversy cannot be maintained on appeal if all the questions have become moot by subsequent acts or events.' " (*Building a Better Redondo, Inc. v. City of Redondo Beach* (2012) 203 Cal.App.4th 852, 866 (*Building a Better Redondo*); see also *Giles v. Horn* (2002) 100 Cal.App.4th 206, 226–227; *Wilson v. L. A. County Civil Service Com.* (1952) 112 Cal.App.2d 450, 453 [" 'although a case may originally present an existing controversy, if before decision it has, through act of the parties or other cause, occurring after the commencement of the action, lost that essential character, it becomes a moot case or question which will not be considered by the court' "].) Put another way, "[a]n appeal should be dismissed as moot when the occurrence of events renders it impossible for the appellate court to grant appellant any effective relief." (*Cucamongans United for Reasonable Expansion v. City of Rancho Cucamonga* (2000) 82 Cal.App.4th 473, 479 (*Cucamongans United*).) One context in which the courts have concluded that an appeal can be mooted by subsequent events is where the repeal or expiration of a law or regulation moots a pending challenge to that law or regulation. (See, e.g., *Paul v. Milk Depots, Inc.* (1964) 62 Cal.2d 129, 133-134 (*Paul*) [repeal of Department of Agriculture regulation while case on appeal moots challenge to that regulation]; *Bell v. Board of Supervisors* (1976) 55 Cal.App.3d 629, 631, 636 (*Bell*) [repeal of statute concerning challenged judicial district moots case].)

"The general rule regarding mootness, however, is tempered by the court's discretionary authority to decide moot issues." (*Building a Better Redondo*, *supra*, 203 Cal.App.4th at p. 867.) Thus, for instance, "[w]hen an action involves a matter of continuing public interest that is likely to recur, a court may exercise an inherent discretion to resolve that issue, even if an event occurring during the pendency of the appeal normally would render the matter moot." (*Ibid*.; see also *Bullis Charter School v. Los Angeles School Dist.* (2011) 200 Cal.App.4th 1022, 1032-1035 (*Bullis*) [allocation of

school district facilities to charter schools issue of broad public interest that is likely to recur because allocation process is an annual one; case not moot despite expiration of the school year].)  In a similar vein, another exception to the mootness doctrine "is where there is a distinct possibility that the controversy between the parties may recur."  (*Bullis*, *supra*, 200 Cal.App.4th at p. 1034.)  Finally, a third exception has been recognized where, "despite the happening of a subsequent event, material questions remain for the court's determination.  [Citations.]  This exception has been applied to declaratory relief actions on the basis that the court must do complete justice once jurisdiction has been assumed."  (*Building a Better Redondo*, *supra*, 203 Cal.App.4th at p. 867.)

In the present case, the trial court granted the City's motion for judgment on the pleadings on the grounds that the case is now moot.  The parties agree that the de novo standard of review applies to an appeal from an order granting a motion for judgment on the pleadings.  (*International Assn. of Firefighters, Local 230 v. City of San Jose* (2011) 195 Cal.App.4th 1179, 1196.)  Thus, " ' "our primary task is to determine whether the facts alleged provide the basis for a cause of action against defendants under any theory." ' "  (*Ibid.*)  In doing so, we may consider matters properly subject to judicial notice.  (*Ibid.*)

Without citation to any authority, however, the City posits that—to the extent our analysis involves application of any exceptions to the mootness doctrine—our review should be for abuse of discretion.  This standard applies, the City argues, because courts have the inherent discretion to retain jurisdiction over moot cases under certain circumstances.  (See, e.g., *Gilb v. Chiang* (2010) 186 Cal.App.4th 444, 460 [a court "may exercise an inherent discretion" to resolve an otherwise moot matter if it involves a question of broad public interest].)  We need not reach this issue here, though, because we would arrive at the same result in this case regardless of the standard used.

**B.**     ***Application of the Mootness Doctrine to This Case***

Having conducted our own independent review of this matter, we are compelled to reach the same conclusion as the trial court—that is, that no justiciable controversy remains for which any kind of effective relief can be granted to Coral, and thus the case is

now moot.  Coral has not sought damages for any past injury and is subject to no present injury.  The challenged 2003 Ordinance is no longer in effect, and, indeed, at the time the trial court rendered its decision in May 2013, the City had been using race- and gender-neutral policies in public contracting for seven years.  As the many cases cited by the City and the trial court make clear, the repeal or expiration of a law generally moots a pending challenge to that law.  (See, e.g., *Paul*, *supra*, 62 Cal.2d at pp. 133-134; *Bell*, *supra*, 55 Cal.App.3d at pp. 631, 636.)  Moreover, as the City concedes, the 2003 Ordinance can never be revived because the extensive factual findings supporting it, made now over a decade ago, are too stale to justify its current use.  Indeed, the Supreme Court made clear in *Coral Construction* that the only remaining issue in this litigation— whether the federal compulsion argument exempts the 2003 Ordinance from the purview of section 31— is "largely factual" and that any factual justification underlying such an ordinance is inherently time limited.  (*Coral Construction*, *supra*, 50 Cal.4th at pp. 332, 336-338.)

Specifically, as the *Coral Construction* Court observed: "Racial preferences are presumptively unconstitutional [citation] and tolerated only when narrowly tailored to serve compelling governmental interests [citation].  The requirement that such preferences withstand strict scrutiny 'reflects that racial classifications, however compelling their goals, are potentially so dangerous that they may be employed no more broadly than the interest demands.  *Enshrining a permanent justification for racial preferences would offend this fundamental equal protection principle*.'  [Citation.] Accordingly, even in the rare case in which racial preferences are required by equal protection as a remedy for discrimination, the governmental body adopting such remedies must undertake an *extraordinary burden of justification* 'to assure all citizens that the deviation from the norm of equal treatment of all racial and ethnic groups is *a temporary matter*, a measure taken in the service of the goal of equality itself.' "  (*Coral Construction*, *supra*, 50 Cal.4th at p. 332, footnote omitted & italics added; see also *Ensley Branch, NAACP v. Seibels* (11th Cir. 1994) 31 F.3d 1548, 1575-1576 ["we refuse simply to assume that the effects of past discrimination in public employment have

17

endured or will endure indefinitely"; after 13 years of affirmative action, new findings must be made to determine whether past discrimination persists]; *Rothe Development Corp. v. U.S. Department of Defense* (W.D. Tex. July 24, 2006) 2006 WL 2052944 [noting that the U.S. Commission on Civil Rights recommends that disparity data used to justify affirmative action be no more than five years old].)

Moreover, since the 2003 Ordinance cannot be revived based on its now-stale findings, it follows that no new preference legislation could be adopted by the City based on that data. Thus, even if we agreed to reach the merits of this case and analyze whether the legislative findings revealed a "strong basis in evidence" justifying the 2003 Ordinance (see *Croson*, *supra*, 488 U.S. at p. 500 (plur. opn. of Powell, J.).), our decision would have absolutely no impact on the future rights of Coral, or any other affected party, under any new preference law. Rather, the City would have to acquire and analyze new data based on current circumstances, and the specifics of that evidence would have to be considered by the courts before a determination could be made regarding the viability of any federal compulsion claim. Under the present circumstances of this case, then, there is simply no actual controversy upon which a judgment could operate, nor any effective relief that could be granted to any party—the very definition of mootness. (See *Eye Dog Foundation*, *supra*, 67 Cal.2d at p. 541; *Cucamongans United*, *supra*, 82 Cal.App.4th at p. 479.)

Coral, however, argues that the City's use of the legislative process to moot the case does not prevent this court from making a judicial determination of the underlying issue—that is, whether the City's use of race- and gender-based preferences is required by the federal equal protection clause. In particular, Coral argues that this Court should allow the case to proceed to the merits because: (1) courts routinely decline to dismiss a case as moot where a defendant discontinues challenged practices with no assurance that it will not reenact them in the future, thereby manipulating events to evade review ; (2) Coral's claim for declaratory relief creates an ongoing controversy; and (3) Coral's challenge raises an issue of broad public interest that is likely to recur. We address each contention in turn.

18

1. *Manipulation of the Legislative Process*

Coral is clearly concerned in this case by the sequence of events under which the City only decided to permanently repeal the 2003 Ordinance while this matter was on remand and cross-motions for summary judgment were pending before the trial court. It argues strenuously on appeal that the City manipulated the legislative process in an attempt to moot the instant matter and that the municipality still stands ready to adopt similar preference legislation in the future. According to Coral, the courts "routinely decline invitations to dismiss cases as moot" where, as here, a defendant discontinues a challenged practice with no assurance that it will not reenact it in the future. In support of this contention, Coral relies on three cases: *Marin County Board of Realtors, Inc. v. Palsson* (1976) 16 Cal.3d 920 (*Palsson*); *Kidd v. State* (1998) 62 Cal.App.4th 386 (*Kidd*); and *Cook v. Craig* (1976) 55 Cal.App.3d 773 (*Cook*). Each of these cases, however, is distinguishable from our present situation.

In *Palsson*, the Marin County Board of Realtors (Board) was accused of violating state antitrust laws by limiting its membership to "persons primarily engaged in the real estate business" and denying non-members access to its multiple listing service (MLS). (*Palsson*, *supra*, 16 Cal.3d at p. 923.) A part-time real estate salesman who was denied membership based on this requirement sought declaratory relief, injunctions granting him Board membership and MLS access, and damages. (*Id.* at pp. 924-925.) The trial court found the regulations of the Board reasonable. While the matter was on appeal, however, the Board voluntarily deleted the bylaw embodying the challenged membership requirement and claimed that the litigation was therefore moot. (*Id.* at p. 928.) The Supreme Court disagreed. It noted that the salesman still had active claims for damages and for injunctive relief permitting MLS access. (*Id.* at pp. 928-929.) It further concluded that the validity of the Board's "primarily engaged" rule was still justiciable despite the deletion of the bylaw because "there is no assurance that the board will not reenact it in the future." (*Id.* at 929.) Moreover, the court found the issues raised to be substantial questions of public interest that were likely to recur as a number of similar cases were pending in the trial courts. (*Id.* at pp. 929-930.)

19

In *Kidd*, plaintiffs challenged the State Personnel Board's policy of "supplemental certification," which allowed certain minority and female applicants for state civil service jobs to be considered for employment even though they did not rank in the top three applicants after competitive testing. (*Kidd*, *supra*, 62 Cal.App.4th at pp. 391-392.) The job classifications at issue in the litigation were with the Department of Fish and Game (Department). The Department's affirmative action plan had allowed for supplemental certification since 1981. However, immediately prior to trial in 1989, the Personnel Board suspended the Department's use of supplemental certification and then argued that the case was moot. (*Id.* at pp. 395-397.) The trial court agreed and dismissed the matter, but the appellate court reversed.[7] (*Id.* at pp. 391, 397.)

Specifically, the appellate court found that, although the Department's use of supplemental certification had been suspended, the regulations implementing the Personnel Board's supplemental certification policy had not been repealed, and the report upon which the Personnel Board based its suspension decision expressly reserved the right to reinstate its use of the remedial program in the future. Thus, there was no assurance that the use of supplemental certification would not be resumed. (*Kidd*, *supra*, 62 Cal.App.4th at pp. 392, 397.) Moreover, the lawsuit was not just aimed at the Department's hiring decisions, but also challenged the Personnel Board's "power, under whatever name, to authorize the use of race or sex as factors which may properly be considered in selecting applicants for appointment to the civil service." (*Id.* at p. 398.) Finally, "and *most importantly*," the court found the issue to be one of "the highest public

_____

[7] The appellate court was clearly influenced by the timing of the Personnel Board's suspension of the policy at issue, stating: "When minority and female applicants who ranked lower than plaintiffs were hired for employment, plaintiffs bought suit challenging the use of supplemental certification. Five years later on the eve of trial, and after using supplemental certification to plaintiffs' disadvantage and consistently defending it as both constitutionally and statutorily permissible, the Board rescinded the Department's remedial order. For defendants now to insist that this moots plaintiffs' action challenging supplemental certification is to run a shell game in which the rule of decision (further mixing the metaphor) is 'heads, I win, tails you lose.' " (*Kidd*, *supra*, 62 Cal.App.4th at p. 399.)

interest" as the challenged policy conflicted with both state statutory and constitutional law. Thus, the issues at stake transcended the plaintiffs' interest in the lawsuit's outcome. (*Id.* at pp. 392, 399-400, italics added.)

Finally, in *Cook*, plaintiffs submitted a Public Records Act request for certain California Highway Patrol (CHP) procedures governing the investigation and disposition of citizens' complaints of police misconduct. (*Cook*, *supra*, 55 Cal.App.3d at p. 777.) While the case was pending, the CHP voluntarily disclosed the information sought. (*Id.* at pp. 779-780.) However, there was no assurance that the CHP's voluntary disclosure had been complete. (*Id.* at p. 780.) Moreover, the CHP continued to maintain that it could withhold similar information in the future. Thus, the CHP's "unilateral decision" to disclose the requested procedures was also "unilaterally rescindable." (*Ibid.*) Under such circumstances, the court could not find that the dispute, involving a matter affecting the public generally, would not recur. Thus, the litigation was not deemed moot. (*Ibid.*)

The factor that distinguishes each of these three cases from the current proceedings is that the courts in *Palsson*, *Kidd*, and *Cook* were all still able to fashion some form of effective relief, despite the claim of mootness. Thus, for instance, in *Palsson*, viable damage and injunctive relief claims remained with respect to the original litigant, and the legal issue involved was one the resolution of which could affect the rights of others with similar cases pending. (*Palsson*, *supra*, 16 Cal.3d at pp. 928-930.) In *Kidd*, the regulations implementing the challenged policy remained in effect and, though not in current use by the Department, could clearly affect other applicants testing for future civil service positions. Further, given the fact that the challenged policy, as a legal matter, conflicted both with provisions of the state Constitution and with certain state employment statutes, the court was able to engage in a statutory analysis broadly applicable to many potential future litigants. (*Kidd*, *supra*, 62 Cal.App.4th at pp. 392, 397-400.) Finally, in *Cook*, the relevant statute remained in effect; the CHP expressly stated that it might refuse to disclose similar materials in the future based on that statute; the court could determine whether the full disclosure sought by the original litigants had occurred; and the court could render a decision on this matter "affecting the public

21

generally" that could impact future litigation. (*Cook*, *supra*, 55 Cal.App.3d at p. 780.) Here, in contrast, a determination whether, as a factual matter, the 2003 Ordinance was legally permissible under a federal compulsion argument helps no one, either now or in the future.

Indeed, another way to understand *Palsson*, *Kidd*, and *Cook*, is to view them as cases in which the issue under consideration was likely to recur and thus its resolution would be of use to future litigants. In the present matter, Coral argues repeatedly that there is every reason to believe that the City will adopt race- and sex-conscious policies in the future. In support of this assertion, they point to the City's long history of awarding public contracts pursuant to the Ordinance and its past claim that it was compelled to enact such preference legislation to combat intentional discrimination. In addition, Coral relies on the Supreme Court's statement in *Coral Construction* that the matter was not moot at that time because "there is no reason to believe the City would not, but for the injunction, renew its long-standing mandate for race- and gender-based preferences." (*Coral Construction*, *supra*, 50 Cal.4th at p. 326, fn. 4.)

We note that, at the time the Supreme Court made this statement, the City had legislation in place that would have revived the 2003 Ordinance if the Permanent Injunction was lifted. Thus, the statement was certainly accurate at that time. Further, the Supreme Court appropriately found the controversy before it justiciable because it was resolving legal issues—whether preference legislation is ever justifiable under a federal compulsion argument and, if so, the framework for analyzing the validity of any such enactment—that could clearly impact not only plaintiffs' future rights but also the rights of future preference litigants. Here, in contrast, there are no important issues the resolution of which would allow future litigation to be avoided or even streamlined. Rather, the remaining inquiry is so fact-specific and time-limited that, not only is it unlikely to recur, it will unequivocally not recur. And, this is true regardless of whether the City decides to enact new preference legislation in the future. Under such

circumstances, we will not rely on *Palsson*, *Kidd*, and *Cook* to render an otherwise moot matter justiciable.[8]

    2.    *Declaratory Relief*

Citing *Eye Dog Foundation,* 67 Cal.2d 536, Coral next argues that the instant case is not moot because its claim for declaratory relief creates an ongoing controversy. In *Eye Dog Foundation*, a school that trained seeing eye dogs, and the blind persons who use such dogs, lost its license to operate because it had no licensed dog trainer on staff. The school sued the state agency that revoked its license, seeking injunctive relief and a declaratory judgment that the state statutes regulating their business were unconstitutional. (*Id.* at p. 540.) In particular, the school challenged section 7210.5 of the Business and Professions Code (section 7210.5), which made it unlawful for a provider of guide dogs to solicit funds unless it was validly licensed. The trial court upheld the majority of the statutes regulating guide dog training, but concluded that

---

[8] For this reason, we also reject Coral's argument, based on *Liberty Mutual Insurance Co. v. Fales* (1973) 8 Cal.3d 712 (*Liberty Mutual*), that we should reach the merits in this litigation because it is likely, through the machinations of the City, to otherwise evade review. In *Liberty Mutual*, an uninsured motorist challenged the constitutionality of a section of the Insurance Code that precluded him from seeking affirmative relief when sued by an insurance company for reimbursement of damages paid. (*Id.* at pp. 714-715.) While the issue was on appeal, the insurance company filed a satisfaction of judgment and then moved to dismiss the matter as moot. It averred that it was unwilling to defend the appeal because it had no realistic likelihood of collecting on its judgment. There was evidence, however, that insurers had been avoiding a judicial determination regarding the constitutionality of the relevant statute by voluntarily dismissing any case challenged on appeal. (*Id.* at p. 715.) The court rejected the argument that the litigation was moot because it concluded that it was a matter of continuing public interest likely to recur and because appellate review had been and might continue to be thwarted by the tactics of the insurance companies. (*Id*. at p. 716.) Here, as discussed above, we do not view the particular issue in this case as likely to recur. Moreover, although the litigation in this instance has been protracted, it has resolved many of the outstanding legal issues, and thus it is likely that any future litigation challenging a similar preference statute would be significantly more streamlined. Finally—in contrast to the *Palsson* situation where the challenged bylaw could be easily reinstated—we highly doubt that the City would ever go to the time and expense of collecting evidence and adopting a new preference scheme, only to repeal the entire framework should a court challenge be filed. We therefore find *Liberty Mutual* inapposite.

23

section 7210.5 was unreasonable as applied to the school because, without funds, it could not hire a new trainer and recover its license. (*Eye Dog Foundation*, *supra*, 67 Cal.2d at p. 540.) While cross-appeals were pending, the school hired a new trainer, and the agency reinstated its license. (*Id.* at p. 541.) Nevertheless, the appellate court determined that the matter was not moot and upheld the entire statutory scheme regulating guide dog training, reversing the trial court's determination that section 7210.5 was unconstitutional. (*Id.* at p. 551.)

The Supreme Court affirmed in an opinion which largely adopted the ruling of the appellate court as its own. (*Eye Dog Foundation*, *supra*, 67 Cal.2d at p. 540 & fn. 1.) Specifically, as is relevant for our purposes, the Supreme Court noted that, generally, " 'when, pending an appeal from the judgment of a lower court, and without any fault of the defendant, an event occurs which *renders it impossible for this court*, if it should decide the case in favor of plaintiff, *to grant him any effectual relief whatever*, the court will not proceed to a formal judgment, but will dismiss the appeal.' " (*Id.* at p. 541, italics added.) However, since the school in *Eye Dog Foundation* was seeking a declaratory judgment that the state statutes at issue were unconstitutional, the high court concluded that this "general rule governing mootness becomes subject to the case-recognized qualification that an appeal will not be dismissed where, despite the happening of the subsequent event, *there remain material questions for the court's determination*. This qualification or exception has been applied to actions for declaratory relief upon the ground that the court must do complete justice once jurisdiction has been assumed [citation], and the relief thus granted may encompass future and contingent legal rights." (*Ibid.*, italics added.)

Applying this "material question" analysis to the facts at hand, the *Eye Dog Foundation* court stressed that both parties agreed that a judgment on the merits would necessarily affect their future rights as the relevant statutory structure remained in effect. Moreover, the parties also concurred that, if the case was dismissed as moot, plaintiff would likely again find itself without a trainer in the future and "thus be relegated to the very situation which precipitated the present litigation." (*Eye Dog Foundation*, *supra*, 67

24

Cal.2d at p. 542.)  Finally, the Supreme Court also held that the question on appeal was one of "general public interest" that was "reasonably sure to rise again" and stated that, for all of these reasons, it was disposed to decide the case on the merits.  (*Ibid*.)

In an attempt to apply *Eye Dog Foundation's* "material question" mootness exception in the present matter, Coral contends that the "single issue left to be decided in this case is whether the City must grant race- and sex-preferences in order to remedy its own pervasive and intentional discrimination based on race and gender" and that a decision on this issue will affect its future rights.  As discussed at length above, however, we disagree.  The issue before this court is not whether the City has been, is, or will be required to pursue preference legislation as a means of ameliorating past intentional discrimination.  Rather, the sole issue available for resolution is whether the City was justified in enacting such legislation in 2003, under a now defunct ordinance.  This is not a "material question" affecting Coral's future rights, and thus *Eye Dog Foundation* is of no help to Coral's mootness challenge.

3.  *Issue of Broad Public Interest that is Likely to Recur*

Coral's final argument against mootness—that its challenge to the Ordinance raises an issue of broad public interest that is likely to recur—must be rejected for the same reasons that have been fatal to its other arguments.  We do not quarrel with Coral's assertion that, as a general matter, the use of race- and gender-preferences to remedy past discrimination is a matter of broad public interest.  (See, e.g., *Kidd*, *supra*, 62 Cal.App.4th at p. 399 ["whether the Board may authorize a policy which accords an advantage in hiring to those of a particular race, ethnicity or sex is clearly an issue of the highest public interest"]; *Department of Corrections v. State Personnel Bd.* (1997) 59 Cal.App.4th 131, 141 ["[p]referential treatment based on inherent, immutable personal characteristics remains a particularly volatile political issue of transcendent public concern"].)  It is arguable, however, that the fact-bound issue that remains in this litigation, involving the validity of a repealed statute, is not itself of general interest.  Moreover—even if we were to find the public interest prong of this test satisfied —for

25

the reasons expressed above, we simply cannot say that the remaining issue preserved in this litigation is likely to recur. Thus, we cannot find the case justiciable on this basis.

**C.** *Dissolving the Permanent Injunction*

Finally, Coral argues that the trial court erred by dissolving the Permanent Injunction. As stated above, the Permanent Injunction provided that the City was permanently enjoined from enforcing the sections of the Ordinance which granted preferential treatment to MBE's and WBE's. In addition, the City was also enjoined from enforcing race- or gender-conscious provisions in any other ordinance enacted after July 26, 2004, to the extent that those provisions were "the same or substantially similar" to the enjoined provisions of the Ordinance.

On remand from the Supreme Court's decision in *Coral Construction*, the trial court dissolved the Permanent Injunction, concluding that the City's action in 2012— which allowed the 2003 Ordinance to finally expire—removed "any basis" for the City to renew it. Since it was "now speculative to say that the City will enact race- or gender-conscious legislation in the future," there was no longer any reason "to maintain an injunction forbidding the City from doing so." Moreover, if the City did enact future legislation believed to be unconstitutional, any affected party could seek relief from that legislation in the courts. Finally, with respect to any future "substantially similar" ordinances, the court also found the Permanent Injunction overbroad, as it did not allow for enforcement of preference legislation required under the federal compulsion argument or permitted pursuant to the exceptions delineated in section 31.

On review, we are bound by the oft-stated rule that " ' "the granting, denial, dissolving or refusing to dissolve a permanent or preliminary injunction rests in the sound discretion of the trial court upon a consideration of all the particular circumstances of each individual case' " and 'will not be modified or dissolved on appeal except for an abuse of discretion.' " (*Salazar v. Eastin* (1995) 9 Cal.4th 836, 850.) Moreover, dissolution of an injunction is proper where there is a material change in the underlying facts or where there has been a change in the applicable law. (Code Civ. Proc, § 533; see also *Lee v. Gates* (1983) 141 Cal.App.3d 989, 994 ["[a] court of equity has inherent

power to modify an injunction in adaption to changed conditions"].) In addition, maintenance of an injunction is warranted only where a showing has been made that past violations probably will recur. (*Palo Alto-Menlo Park Yellow Cab Co. v. Santa Clara County Transit Dist.* (1976) 65 Cal.App.3d 121, 132.) Given the posture of this case, we cannot find an abuse of discretion in the trial court's decision to dissolve the Permanent Injunction.

First, the initial portion of the Permanent Injunction, enjoining enforcement of the Ordinance, is clearly no longer necessary as the Ordinance has finally expired and—given the staleness of the factual findings upon which is was based—cannot be resurrected. With respect to the portion of the Permanent Injunction prohibiting future ordinances with the "same or similar provisions," we agree with the trial court that the language of the injunction is overbroad. Although Coral argues that the Permanent Injunction is meant merely to enjoin public contracting policies which violate Proposition 209, the language clearly covers all similar preference legislation, even if otherwise mandated by federal law or permitted by section 31. More importantly, however, it is clear that, were the City ever to decide to adopt a future ordinance similar to the Ordinance, the matter would have to be litigated anew based on the specifics of the evidence supporting that legislation. As the trial court recognized, "there is no benefit to adjudicating that issue in the context of a motion to enforce an injunction as opposed to a new lawsuit." Indeed, there are several arguments against it. Under such circumstances, we find the trial court's dissolution of the Permanent Injunction appropriate, and certainly see no abuse of discretion.

### III. DISPOSITION

The judgment is affirmed. Each party to bear their own costs.

_____
Reardon, J.

We concur:


_____
Rivera, J.


_____
Ruvolo, P.J.